353 S.E.2d 318

**Janet PAULEY, et al.**

v.

**Glen B. GAINER, Jr., et al.,
Defendants Below,**

**The Hon. Arch A. Moore, Jr., Governor,
Etc., Intervenor.**

**No. CC956.**

Supreme Court of Appeals of
West Virginia.

March 13, 1986.

Concurring Opinion March 19, 1986.

Daniel F. Hedges, Charleston, for appellants.

Charlie Brown, Atty. Gen., Silas B. Taylor, Deputy Atty. Gen., Charleston, for appellees.

MILLER, Chief Justice:

This appeal involves two certified questions. The first question is whether the Governor was an indispensable party to the underlying proceeding which sought to challenge the propriety of the Governor's line-item veto of seven million dollars in the 1985–86 fiscal year budget bill. The second question relates to the substantive issue, the propriety of the veto itself.

These issues arise in the context of pending litigation in which the plaintiffs, who are the parents of children enrolled in the public school system, filed a class action suit challenging the constitutionality of the public school system. In the original action, the defendants were the State Treasurer, the State Auditor, the members of the State Board of Education, and the State Superintendent of Schools.

A brief procedural history of the underlying litigation will be useful. The class

action was originally dismissed in the Circuit Court of Kanawha County for failure to state a claim upon which relief could be granted. In *Pauley v. Kelly*, 162 W.Va. 672, 255 S.E.2d 859 (1979), we reversed the dismissal and established certain guidelines to be followed on remand. After extensive hearings were held, the circuit court found several aspects of the public school financing system to be unconstitutional and ordered the development of a master plan by the defendants. This master plan was subsequently developed and approved in a final order entered March 4, 1983. No appeal was taken from this order. More recently, we addressed some additional issues arising out of this same class action. In *Pauley v. Bailey*, 174 W.Va. 167, 324 S.E.2d 128 (1984), the plaintiffs contended certain policy directives of the State Board of Education and the State Superintendent of Schools contravened the March 4, 1983 final order of the circuit court. We found that the policy directives did not comply with the master plan.[1]

The present controversy had its genesis on August 8, 1985, when the plaintiffs filed a motion for an order of implementation in which they contended the Governor's line-item veto of seven million dollars from the 1985–86 fiscal year budget bill was improper. This appropriation was intended to finance salary equity adjustments for school teachers and school service personnel. The original defendants were served with the motion, but because the Governor was not an original party defendant, he was not

served. The motion was heard on August 21, 1985. At the hearing, the State Auditor objected to the circuit court's ruling on the motion until the Governor was made a party. The circuit court overruled this objection, heard arguments, and, after framing the two certified questions, ruled on them.

The circuit court ruled that the Governor was not an indispensable party and that his line-item veto was contrary to the law. On appeal, we accepted the certified questions and upon the Governor's motion we permitted him to intervene and argue before this Court.

On the procedural issue of his right to be made a party in the underlying action, the Governor argues that Rule 19(a) of the West Virginia Rules of Civil Procedure (W.Va.R.C.P.) mandates that he was an indispensable party.[2]

Initially, we observe that this case involves several unique features. The present case marks the first time that we have accepted a case challenging the validity of a governor's veto that was first decided in circuit court rather than in this Court by way of an original mandamus as was done in the following cases.[3] *State ex rel. Steele v. Kopp*, 172 W.Va. 329, 305 S.E.2d 285 (1983); *State ex rel. Brotherton v. Blankenship*, 158 W.Va. 390, 214 S.E.2d 467 (1975); *State ex rel. Brotherton v. Blankenship*, 157 W.Va. 100, 207 S.E.2d 421 (1973); *Russell Transfer, Inc. v. Moore*, 158 W.Va. 534, 212 S.E.2d 433

---

1. In an earlier per curiam opinion, we held that a citizen's attempt to intervene in this class action was untimely. *Pauley v. Bailey*, 171 W.Va. 651, 301 S.E.2d 608 (1983).

2. Rule 19(a), W.Va.R.C.P., provides, in part:
   "(a) *Persons to be joined if feasible.*—A person who is subject to service of process shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest, or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise in-

consistent obligations by reason of his claimed interest...."

3. The parties do not argue and, therefore, we do not decide whether it was proper for the veto issue to have been raised in the underlying action. It is apparent, however, that from the standpoint of judicial economy and time, an original mandamus in this Court would have involved less delay. When a challenge to a veto comes to this Court by way of an appeal or certified question from a circuit court, the delay between the time it was filed in and decided by the circuit court and appealed to and decided by this Court may render the issue moot because the fiscal year pertaining to the line-item veto may have expired.

(1975); *State ex rel. Browning v. Blankenship*, 154 W.Va. 253, 175 S.E.2d 172 (1970).[4]

The other unique feature of the present case is that the issue sought to be litigated in the underlying case was essentially a new issue that was independent of the original mandate of the circuit court. This issue involving the validity of the Governor's line-item veto of an appropriation included in the 1985–86 fiscal year budget bill was an action that occurred after the entry of the circuit court's final order filed on March 4, 1983. *Pauley v. Bailey*, 174 W.Va. at 171–72, 324 S.E.2d at 132. As we have previously indicated, the present case could have been brought in this Court as an independent mandamus action.

Thus, the character of the issue in the underlying suit is not a continuation or enforcement of issues that were previously resolved by the circuit court's final order, but is a new and independent issue brought about by the Governor's April 20, 1985 line-item veto. With the underlying case in this posture, we believe that it is analogous at least insofar as the Governor is concerned, who was not a party to the underlying case, to a new action which would require the application of Rule 19(a), W.Va.R.C.P.[5]

■ Under this rule, the Governor must be deemed to be an indispensable party since it is his action regarding the line-item veto which is the subject matter of the litigation. Under Rule 19(a), W.Va.R.C.P., a person becomes an indispensable party if he has "an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may ... as a practical matter impair or impede his ability to protect that interest...." It is difficult to conceive of how the matter could have been fairly adjudicated without the Governor being brought into the suit. Under the provisions of Article VI, Section 51(D)(11) of the West Virginia Constitution, only the governor has the constitutional authority to veto or reduce items in the budget bill.[6]

■ Even the most rudimentary notions of due process would dictate this result in the absence of Rule 19(a), W.Va.R.C.P., as we indicated in Syllabus Point 2 of *Simpson v. Stanton*, 119 W.Va. 235, 193 S.E. 64 (1937): "The due process of law guaranteed by the State and Federal Constitutions, when applied to procedure in the courts of the land, requires both notice and the right to be heard." *See also Tucker v. Tucker*, 176 W.Va. 80, 341 S.E.2d 700 (1986) (per curiam); *Menon v. Davis Memorial Associates, Inc.*, 160 W.Va. 453, 235 S.E.2d 817 (1977) (per curiam); *Sisler v. Hawkins*, 158 W.Va. 1034, 217 S.E.2d 60 (1975). Therefore, we conclude in an action brought in circuit court challenging a governor's exercise of his constitutional authority to veto or reduce items in a budget bill, the governor is an indispensable party under Rule 19(a), W.Va.R.C.P.

In holding that the Governor was an indispensable party, we do not wish to imply that in other suits involving subor-

---

4. In most of these cases, the governor was made a party by way of intervention and, although we did not discuss the right of intervention in these mandamus cases, we commented on this issue in *State ex rel. Evans v. Kennedy*, 145 W.Va. 208, 215, 115 S.E.2d 73, 78 (1960):

"As a general rule any person having an interest in the subject matter or whose right or interest will be affected by the judgment awarding the writ, may intervene in a mandamus proceeding. There must, however, be a proper showing of substantial interest in the subject matter to authorize an intervention and a person on whom rests no duty to perform the act sought to be enforced in the mandamus proceeding, or who has no substantial and peculiar interest in the subject matter of the litigation, or whose interest will not be affected by a judgment awarding the writ can not intervene as a party...."

5. The pertinent language of Rule 19(a), W.Va. R.C.P., is set forth in note 2, *supra*.

6. Article VI, Section 51(D)(11) of the West Virginia Constitution provides, in part:

"Every budget bill or supplementary appropriation bill passed by a majority of the members elected to each house of the legislature shall, before it becomes a law, be presented to the governor. The governor may veto the bill, or he may disapprove or reduce items or parts of items contained therein. If he approves he shall sign it and thereupon it shall become a law. The bill, items or parts thereof, disapproved or reduced by the governor, shall be returned with his objections to each house of the legislature."

dinate executive officers that the Governor must always be joined as a party. Much depends on whether the Governor has a substantial and direct involvement in the issue litigated. In *Wachter v. Dostert*, 172 W.Va. 93, 303 S.E.2d 731 (1983), we held that the State Department of Highways was not an indispensable party in litigation involving two adjoining landowners who were contesting whether a road was public or private and gave this general statement in its single Syllabus:

"Rule 19(a) of the West Virginia Rules of Civil Procedure requires two general inquiries for joinder of a person who is subject to service of process. First, is his presence necessary to give complete relief to those already parties? Second, does he have a claim that, if he is not joined, will be impaired or will his non-joinder result in subjecting the existing parties to a substantial risk of multiple or inconsistent obligations? If the absent person meets the foregoing test, his joinder is required. However, in the event that the absent person cannot be joined, the suit should be dismissed only if the court concludes that the 19(b) criteria cannot be met."

In the present case, despite the fact that other State officials were in the underlying suit, they had no direct or substantial interest in advocating the propriety of the Governor's veto. Thus, it was clearly a constitutional prerogative of the Governor that was being challenged and his indispensability is apparent. The result would be different if the suit involved the action of some administrative agency such as illustrated by the underlying suit itself. The original class action challenged the constitutionality of the public school system and the defendants were those agencies and officers who were directly involved in its administration. The governor at the time the suit was filed was not a named party and would not have been an indispensable party under Rule

19(a) because the matter did not involve an issue with which his office was directly involved.

The California Supreme Court addressed this question in *Serrano v. Priest*, 18 Cal.3d 728, 557 P.2d 929, 135 Cal.Rptr. 345, *cert. denied*, 432 U.S. 907, 97 S.Ct. 2951, 53 L.Ed.2d 1079 (1977), where the governor and legislature contended they were indispensable parties in litigation involving the constitutionality of the financing of its public school system. In concluding they were not indispensable parties under a rule similar to our Rule 19(a), the California Supreme Court stated:

"[A]s we ... said in the *Bank of California [v. Superior Court*, 16 Cal.2d 516, 521, 106 P.2d 879, 883 (1940)] case, in dealing with the doctrine of indispensable and necessary parties 'we should ... be careful to avoid converting a discretionary power or a rule of fairness in procedure into an arbitrary and burdensome requirement which may thwart rather than accomplish justice.' ... In the instant case it is quite clear that no governmental interest has lacked for able and willing advocates in the absence of the Legislature and Governor as parties. This case has been well-known to those entities since its inception, yet they have at no point sought intervention or indicated any interest in doing so." (Citations and footnotes omitted).

*See also Van Atta v. Scott*, 27 Cal.3d 424, 613 P.2d 210, 166 Cal.Rptr. 149 (1980); *Nason v. Commonwealth*, 90 Pa.Cmwlth. 130, 494 A.2d 499 (1985).

Because we have concluded the Governor was an indispensable party in the underlying proceeding which challenged his line-item veto, we decline to address the substantive issue of whether the line-item veto was proper.[7]

Answered and Dismissed.

---

7. A major problem in resolving the substantive issue is that the Governor's response raises certain factual issues which appear to counter some of the plaintiffs' claims. The major contention of the Governor is that the seven million dollar line-item veto in the budget bill took place before House Bill 2089, 1985 W.Va. Acts,

Ch. 57, was presented to and signed by him. This bill, a portion of which is contained in W.Va. Code, 18A–4–5c (1985), authorizes ten million dollars to be paid out of surplus revenues for school teacher and school service personnel salary equity adjustments, and that this along with an additional twenty-nine million

BROTHERTON, Justice, concurring:

While I agree with the majority's opinion, I wish to add the following comments:

The Boone County Circuit Court certified to this Court a second question: "2. Whether the Governor had the authority under the West Virginia Constitution and law to line item veto the equity funds mandated by West Virginia Code, § 18a–4–5c?" The Circuit Court answered this question in the negative.[1] I disagree with the lower court, the answer to Certified Question No. 2 should be: Yes, the Governor did have the authority under the West Virginia Constitution to line item veto the W.Va. Code § 18A–4–5c (1985) equity funds appropriated in the FY 1985–86 budget.

Article VI, Section 51B of the West Virginia Constitution mandates that within ten days after the convening of a regular session of the legislature the Governor shall submit to the legislature a budget[2] for the next fiscal year (which begins on the 1st day of July), and the budget bill shall contain a complete plan of the proposed expenditures and estimated revenues for the fiscal year including the estimated surplus or deficit at the end of the fiscal year.[3]

The Governor, pursuant to the Constitution, submitted to the legislature a statement containing an estimate of the general revenues[4] (identified as general revenue fund) the payment of revenue submitted on the first day of the 1985 legislative session, and the total estimated receipts and balances available for appropriation for FY 1985–86 of $1,557,919,000.00. The budget bill submitted at the same time contained

dollars left in the budget more than covered the line-item veto of seven million dollars for salary equalization.

1. The trial court below found that the Governor's veto was illegal because it negated W.Va. Code § 18A–4–5c (1985). Unfortunately, *none* of the parties below informed the trial court that Code 18A–4–5c (1985) (House Bill 2089) had not become effective, and *had not even been presented to the Governor,* when he vetoed the surplus appropriation. Thus, the plaintiff's reliance on this bill as "substantive law," which bound the Governor to approve the budget bill's appropriation of surplus, is factually unfounded.

2. For purposes of identification, the budget subject of this action is referred to as FY 1985–86, meaning the fiscal year beginning July 1, 1985, and ending June 30, 1986.

3. Article VI, Section 51(B) provides, in part: Accompanying each budget shall be a statement showing: (a) An estimate of the revenues and expenditures for the current fiscal year, including the actual revenues and actual expenditures to the extent available, and the revenues and expenditures for the next preceding fiscal year; (b) the current assets, liabilities, reserves and surplus or deficit of the State; (c) the debts and funds of the State; (d) an estimate of the State's financial condition as of the beginning and end of the fiscal year covered by the budget; (e) any explanation the Governor may desire to make as to the important features of the budget and suggestions as to methods for reduction or increase of the State's revenue.

**A.**

**GENERAL REVENUE FUND**

**STATEMENT OF REVENUES, EXPENDITURES AND CHANGES IN FUND BALANCE**

**(In Thousands)**

| | | | |
|---|---|---|---|
| Cash Balance July 1, 1984 | | | $ 142,170 |
| Less: 92 Day Disbursements (July 1 through September 30, 1984) | | $ 16,853 | |
| Amounts Reappropriated to FY 1984–85 | | 40,414 | |
| | | | $( 57,267) |
| Accumulated Gross Surplus at the Close of FY 1983–84 | | $ 84,903 | |
| Plus: Revised Revenue Estimate FY 1984–85 | | | $ 1,477,000 |
| Total Estimated Receipts and Balance | | | $ 1,561,903 |
| Less: Appropriations—FY 1984–85 | $1,505,930 | | |
| Recommend Supplemental Appropriations FY 1984–85 | $ 11,883 | | |
| Recommended Claims | $ 171 | $ 1,517,984 | |
| Estimated Balance Available June 30, 1985 | | | 43,919 |
| Plus: Estimated Revenue FY 1985–86 | | | $ 1,514,000 |
| Total Estimated Receipts and Balance | | | $ 1,557,919 |
| Less: Recommended Appropriation FY 1985–86 | $1,557,438 | | |
| | | | $(1,557,438) |
| Estimated Balance— June 30, 1986 | | | $ 481 |

recommended appropriations for FY 1985–86 of $1,557,438,000.00, including an estimated surplus on June 30, 1986, of $481,000.00. The budget bill (the appropriations part of the budget) was introduced in both houses of the legislature and given a number. In the 1985 legislative session the budget bill which was finally enacted into law was committee substitute Senate Bill 200.

In order to provide for equal educational opportunities for students of this State in all fifty-five counties, the Circuit Court of Kanawha County in a 244 page Opinion, Findings of Fact and Conclusions of Law and Order entered May 11, 1982, pursuant to the directions of this Court in *Pauley v. Kelly*, 162 W.Va. 672, 255 S.E.2d 859 (1979), required that the pay of the teachers be equalized and thereby upgraded. Pursuant to that decision, the budget bill included an item designated Item 33, State Department of Education—State Aid to Schools (W.Va.Code Ch. 18, 18A) Acc't. No. 2940 Salary Equalization—Total $5,600,000.00.[5]

The legislature, however, decided to address this problem differently, and in the 1985 session, passed House Bill 2089, which included what would become W.Va.Code § 18A–4–5c (1985)[6], dealing with equity appropriation from surplus revenue.[7] The statute provided that the *first* $10,000,000.00 of surplus funds from the State general revenue fund that has accrued as of the 30th day of June, 1985, shall be appropriated and expended for fiscal year 1985–86 in accordance with W.Va.Code 18A–4–5. The statute further provided that if $10,000,000.00 in surplus was not available, then the appropriation should be reduced accordingly to the amount that was available as of that date.

After passing House Bill 2089 the legislature then passed committee substitute for Senate Bill 200, the budget bill, on the 16th day of April, 1985, to take effect from passage.[8] In the substitute, the legislature reduced the Governor's appropriation for teacher equity (Account 2940) from $5,600,000.00 to $0.00. After reducing Account 2940 to $0.00, the legislature inserted a "Section 6" into the budget bill, appropriating the surplus revenue.[9] This was an appropriation out of surplus monies that

---

**5.** Chapters 18 and 18A of the Code of the State of West Virginia deal with education and more particularly with formulas and methods for the payment of salaries for school personnel, both teachers and service, other than higher education.

**6.** West Virginia Code § 18A–4–5c (1985) states:
The first ten million dollars of surplus funds from the state fund, general revenue, that have accrued as of the thirtieth day of June, one thousand nine hundred eighty-five, shall be appropriated and shall be expended during fiscal year one thousand nine hundred eighty-five—eighty-six, in accordance with section five [§ 18A–4–5] of this article, subject to the terms and conditions set forth in this section and in said section five.
In the event that the surplus revenues as of the thirtieth day of June, one thousand nine hundred eighty-five, are not sufficient to meet all of the appropriation mandated by this section, then the appropriation shall be available only to the extent of the total actual surplus accrued as of said date.

**7.** House Bill 2089, 1985 W.Va. Acts c. 57, passed April 13, 1985, to take effect July 1, 1985, contained the language relating to equity pay for teachers which became W.Va. Code § 18A–4–5c (1985).

**8.** In this opinion I do not undertake to pass upon the question of whether House Bill 2089 was or was not a valid appropriation bill and if so whether under the Constitution it could be passed prior to passage of the budget bill. *See generally* W.Va. Const., Art. VI, § 51 C(7).

**9.** Senate Bill 200, Section 6, states as follows:
Sec. 6. Appropriation from surplus revenue.—The following item is hereby appropriated from the state fund, general revenue, and is to be available for expenditure during the fiscal year 1985–86 out of surplus funds only, subject to the terms and conditions set forth in this section.
It is the intent and mandate of this legislature that the following appropriation made by this section shall be payable only from the surplus accrued as of June 30, 1985.
In the event that the surplus revenues as of June 30, 1985, are not sufficient to meet all of the appropriation made by this section, then the appropriation shall be available only to the extent of the total actual surplus accrued as of June 30, 1985.
122—State Department of Education—State Aid to Schools Account 2950
Salary Equalization—Total—7,000,000.00.

might be available after June 30, 1986, of $7,000,000.00 in Account 2950 for salary equalization, which is similar to Account 2940, which had been reduced to $0.00.[10] Account 2950 had never been a part of Senate Bill 200 presented to the legislature at the beginning of the session.

The Governor then vetoed Section 6 (Account 2950) pursuant to his authority for a line item veto.[11] The Governor's veto was to an item not contained in budget bill when he presented it to the legislature and was, therefore, a veto to an unconstitutional appropriation.

This question was addressed previously by this Court in *State ex rel. Brotherton v. Blankenship*, 158 W.Va. 390, 214 S.E.2d 467 (1975). In that case, the Governor, in his budget bill presented to the legislature, provided in the various accounts certain line item sums of money for personal services. The legislature amended the bill, expanding the Governor's budget by specifying positions under the item Other Personal Services, and designating salaries for each position, and the Governor vetoed

those line items relating to specific positions and salaries under the line item lump sum appropriation for personal services and returned the amount of money for the personal services to a total sum. Justice Haden, writing for the Court, noted that the Modern Budget Amendment provides for an Executive Budget and not a Legislative Budget and the legislature must first enact the executive budget before it could originate an appropriation measure creating an item or part of an item.[12] The legislature, therefore, is limited to increasing or decreasing the monetary amounts originally submitted by the Governor in his budget. The legislature in the Budget Bill for FY 1985–86 exercised this prerogative as to Account 2940 when they reduced the Governor's budget request of $5,600,000.00 to $0.00. By the constitutional limitation for an executive budget that is the limit of their power to amend the budget bill as submitted. The legislature is not prohibited from originating an appropriation measure creating an item or part of an item, but only after it has enacted the budget bill. *See* W.Va. Const., Art. VI, Section 51

---

**10.** The difference in the accounts is that Account 2940 was an appropriation outside the school aid formula as to the distribution of the equalization money, and Account 2950 put the $7,000,000.00 surplus, if available, in the state aid formula for distribution.

**11.** W.Va. Const., Art. VI, § 51–D-(11)

**12.** "As respects the Budget Bill, Subsection B(5) of the Amendment permits the Legislature to amend the Bill as prepared and introduced by the Governor. But, that authority is restricted: 'The Legislature shall not amend the budget bill so as to create a deficit but may amend the bill by increasing or decreasing any item therein: ....' W.Va. Const. art. VI, § 51, B(5). In the first *Brotherton* case, Justice Caplan, speaking for a majority of the Court, construed this provision thusly:

'Article 6, Section 51(5) of our Constitution permits the Legislature to "amend the bill by increasing or decreasing any item therein", so if it had increased or decreased the *amount* of an item such as "Other Personal Services" its action would be in line with that allowed. However, when the Legislature undertook to

expand on the Governor's budget by specifying positions under the item "Other Personal Services" and designated salaries therefor, it began to usurp the executive power reserved by the Constitution for that branch of government. The Constitution clearly contemplates an executive budget....'

....

'... [T]he Legislature can then exercise its judgment as to whether the executive *figures* should be increased, decreased or approved as submitted. Thus the Legislature is afforded the prerogative contemplated by the Constitution.' (Emphasis supplied), [*State ex rel. Brotherton v. Blankenship*, 157 W.Va. 100, 122–23, 207 S.E.2d 421, 434–35 (1973)].

In our view, this court, in order to preserve for the executive department its authority to prepare and submit a budget and thereby insure initial consideration of its fiscal proposals and priorities, relatively intact or without substantial modification by the Legislature, thereby clearly held that the Legislature's authority to increase or decrease items was limited to increase or decrease of the monetary amounts originally submitted by the Governor." *State ex rel. Brotherton v. Blankenship*, 158 W.Va. 390, 405, 214 S.E.2d 467, 478 (1975).

C(7). Nevertheless, the legislature, in adding a totally new appropriation measure (Section 6) to the budget bill, went beyond its constitutional authority.

The action of the legislature in inserting Section 6 in the budget was unconstitutional and, therefore, the veto by the Governor of Section 6 was proper.