376 S.E.2d 113

STATE of West Virginia ex rel. the BOARDS OF EDUCATION OF THE COUNTIES OF UPSHUR, ET AL., Petitioners,

v.

Honorable Robert G. CHAFIN, Special Judge, Respondent.

Michael E. CARYL, West Virginia State Tax Commissioner; Glen B. Gainer, West Virginia State Auditor; and Tom McNeel, State Superintendent of Schools, Petitioners,

v.

Honorable Robert G. CHAFIN, Special Judge, Respondent.

Nos. 18522, 18523.

Supreme Court of Appeals of West Virginia.

Nov. 23, 1988.

Norman T. Farley, Coleman & Wallace, Buckhannon, for petitioners.

Silas B. Taylor, Charleston, for defendant St. Auditor and St. Tax Comm. Below.

Brentz Thompson, W.Va. Dept. of Ed., Charleston, for St. Ed. defendant Below.

Daniel F. Hedges, Charleston, for plaintiffs below.

Boyce Griffith, Hamlin, for Lincoln Co. Ed. defendant below.

Edward Rebrook III, Charleston, for plaintiff St. Treasurer Below.

MILLER, Justice:

These cases, consolidated for decision, stem from a constitutional challenge to the excess levy provisions found in W.Va. Const. art. X, § 10, which are designed to help finance the State's public schools.[1] On May 11, 1982, the Kanawha County Circuit Court declared the excess levy provisions to be violative of equal protection principles. The court determined that dependence on county funds, particularly excess levies, promoted unequal treatment of students in poor and wealthy counties.

The tax commissioner, the auditor, and some thirty-three county boards of education ask to prohibit implementation of the court's remedial order dated June 29, 1987. That order would withhold a proportion of State school funding from counties with excess levies, and distribute the sums withheld equitably to other counties. It is contended that the constitutional authorization of excess levies forecloses them from being declared unconstitutional. We agree.

## I.

To better understand the issues presented, it is necessary to generally outline West Virginia's school financing system. W.Va. Code, 18–9A–1, *et seq.*, sets out the State's public school support plan, popularly known as the school financing formula. The formula contemplates a shared responsibility of education costs to be borne by the State and individual counties.

Very broadly, the operation of the formula may be described as follows. First, a county's estimated level of need, or "basic foundation program," is determined. The basic foundation program is the total sum required for each of seven categories of need, viz., professional educators, service personnel, fixed costs, transportation costs, administrative costs, other current expenses and substitute employees, and improvement of instructional programs. W.Va.Code, 18–9A–12.[2]

Second, the county's "local share" must be computed. W.Va.Code, 18–9A–11(a). Local share is the amount of tax revenue which will be produced by levies, at specified rates, on all real property situate in the county. Local share thus represents the county's contribution to education costs on the basis of the value of its real property. State funding is provided to the county in an amount equal to the difference be-

---

**1.** It should be noted that the ruling involved in this case was made by Judge Jerry W. Cook of the Twenty–Fifth Judicial Circuit. He was appointed as special judge to the Circuit Court of Kanawha County to handle the continuation of matters arising from *Pauley v. Kelly,* 162 W.Va. 672, 255 S.E.2d 859 (1979), after the resignation of Judge Arthur M. Recht. Judge Cook resigned and this Court, by administrative order, appointed Judge Robert Chafin of the Twenty–Fourth Judicial Circuit as special judge.

The final order entered below by Judge Recht was never appealed to this Court. Several aspects of the master plan approved by Judge Recht have been before this Court. *E.g., Pauley v. Gainer,* 177 W.Va. 464, 353 S.E.2d 318 (1986); *Pauley v. Bailey,* 174 W.Va. 167, 324 S.E.2d 128 (1984).

**2.** These categories of need are defined in W.Va. Code, 18–9A–4 to –10.

tween the basic foundation program and the local share. W.Va.Code, 18–9A–12.

Other local funds may also be raised. W.Va. Const. art. X, § 10 authorizes any county to increase, by as much as 100 percent, the maximum levy rates allowable for public schools. These increases, or "excess levies," must be approved by a majority vote and are valid for up to five years.[3] Revenues derived from excess levies are used for a wide variety of purposes, including salary supplements for school personnel, free textbooks for students, and other current operating expenses. It is represented by the parties that forty-three West Virginia counties presently have excess levies. The anticipated revenues from these levies for the fiscal year 1987–88 is over $121,000,000.

## II.

The present cases are traceable to a 1975 civil suit filed in the Kanawha County Circuit Court by the parents of Lincoln County public school students. The complaint in that suit prayed for a declaration that features of the State's system for financing public schools denied equal educational opportunities. The circuit court noted that certain inequities were present in the system, but dismissed the suit.

On appeal, we held that the guarantee of a "thorough and efficient" system of public schools contained in W.Va.Const. art. XII, § 1, made education a fundamental right. For this reason, we held in Syllabus Points 3 and 4 of *Pauley v. Kelly*, 162 W.Va. 672, 255 S.E.2d 859 (1979), that our school financing system was subject to strict scrutiny for equal protection purposes:[4]

"3. The mandatory requirements of 'a thorough and efficient system of free schools' found in Article XII, Section 1 of the West Virginia Constitution, make education a fundamental, constitutional right in this State.

"4. Because education is a fundamental, constitutional right in this State, under our Equal Protection Clause any discriminatory classification found in the State's educational financing system cannot stand unless the State can demonstrate some compelling State interest to justify the unequal classification."

We, therefore, reversed the judgment and delineated the issues to be developed on remand. Those issues included whether, and to what extent, the system's dependence on county excess levies promoted unequal educational opportunities.[5]

Upon remand, the circuit court, in a detailed opinion and order dated May 11, 1982, declared some features of the school financing system to be constitutionally infirm and noted that the inequities were attributed to undue reliance on excess levies, which favored property-rich counties.[6]

---

**3.** W.Va. Const. art. X, § 10 provides, in part:
"Notwithstanding any other provision of the Constitution to the contrary, the maximum rates authorized and allocated by law for tax levies on the several classes of property for the support of public schools may be increased in any school district for a period not to exceed five years, and in an amount not to exceed one hundred percent of such maximum rates, if such increase is approved, in the manner provided by law, by at least a majority of the votes cast for and against the same."

**4.** In *Pauley,* we placed considerable reliance on the New Jersey Supreme Court's decision in *Robinson v. Cahill,* 62 N.J. 473, 303 A.2d 273 (1973), which interpreted its "thorough and efficient" constitutional education clause. We concluded that our Constitution set a higher standard for state support of public education than articulated by the United States Supreme Court in *San Antonio Indep. School Dist. v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973).

**5.** We held in *Pauley* that excess levies *per se* were not subject to equal protection challenge. The reason was twofold: (1) they are constitutionally provided for and (2) they are determined voluntarily by the voters in the county. We further noted, however, that "there are limits to the amount of reliance that can be placed on this source of funds, considering the State government's constitutional responsibility to assure a thorough and efficient system of schools." 162 W.Va. at 712, 255 S.E.2d at 880.

**6.** The court stated:
"The reliance on locally funded excess levies to provide educational programs essential to a thorough and efficient system of education violates Article XII, section 1 of the Constitution because the amount of revenue that is raised through the excess levy varies dramatically among counties based upon the local property wealth of the county and the ability of voters to approve an excess levy.

The court appointed a committee to develop a master plan to bring the system into constitutional compliance. As submitted to the court, the master plan recommended the enactment of a statewide excess levy to supplant the various county excess levies. The plan was approved, as revised, by order of March 4, 1983. The court declined to adopt a timetable for implementation of the plan, but rather called on the Governor and Legislature to promptly fulfill their constitutional duties.

On January 8, 1985, after almost two years of inactivity, the plaintiffs below moved the court to address the excess levy problem. A December 5, 1985 order of the circuit court stated that if the Legislature did not, by July 1, 1987, replace or equalize excess levy revenues by one of the methods enumerated therein,[7] the court would direct a more equitable distribution. The Legislature promptly adopted a constitutional amendment to authorize a statewide excess levy. This proposed amendment was to be submitted to the voters in a special election to be held on March 5, 1988.[8]

The court entered a supplemental order on June 29, 1987. This order provided that if the statewide excess levy was not approved, a sum equal to 20 percent of each county's excess levy revenues would be withheld from State school funding in fiscal year 1988–89. The sums withheld were to be increased by an additional 20 percent in each of the next four fiscal years. These sums were to be distributed to other counties "on an equitable basis prescribed by the court." The statewide excess levy amendment was defeated at the special election held on March 5, 1988, and the supplemental order thereby became operative.

On April 8, 1988, the tax commissioner and auditor petitioned this Court for a writ of prohibition to bar enforcement of the supplemental order. A separate petition by thirty-three county boards of education was filed on the same day. We issued rules to show cause in each of the cases on June 22, 1988, made returnable on September 13, 1988.[9] It is contended that the order was constitutionally invalid and, therefore, exceeded the court's jurisdiction.

### III.

#### A.

A number of states without a "thorough and efficient" education clause in their constitutions have followed the equal protection analysis used in *San Antonio Indep. School Dist. v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). There, the United States Supreme Court concluded that education was not a fundamental right. Consequently, where an equal protection challenge is made to a state education statute, the state need only show that there is a rational basis for the statute. *E.g., McDaniel v. Thomas*, 248 Ga. 632, 285 S.E.2d 156 (1981); *Thompson v. Engelking*, 96 Idaho 793, 537 P.2d 635 (1975); *Hornbeck v. Somerset County Bd. of Educ.*, 295 Md. 597, 458 A.2d 758 (1983); *Fair School Fin. Council of Oklahoma, Inc. v. State*, 746 P.2d 1135 (Okla.1987); *Richland County v. Campbell*, 294 S.C. 346, 364 S.E.2d 470 (1988).

These jurisdictions hold that local taxation for the support of schools is rationally related to the state's interest in allowing

---

Counties that are unable to pass an excess levy cannot fund high quality programs. Many other counties are unable to provide high quality programs because even a 100% levy is inadequate to meet the county's needs. Because the state is responsible for providing a thorough and efficient system of education, it cannot make fulfillment of this responsibility dependent on the ability to pass an excess levy or the amount of money that can be raised by an excess levy."

7. The proposed methods included a statewide excess levy, an increased ratio of real property

assessments to fair market value, a dedicated tax, or additional funds from general revenue.

8. House Joint Res. 29 (passed March 14, 1987). The amendment would have provided a uniform 90 percent excess levy. Counties with excess levies over 90 percent were to receive a credit so as to equalize the levy rate.

9. The state superintendent of schools and the state board of education intervened in the case on May 18, 1988.

local control over education policy. As the Georgia Supreme Court stated in *McDaniel:* "[T]he Georgia public school finance system preserves the idea of local contribution, perhaps out of concern 'that along with increased control of the purse strings at the state level will go increased control over local policies.' " 248 Ga. at 648, 285 S.E.2d at 167, *quoting San Antonio Indep. School Dist. v. Rodriguez,* 411 U.S. 1, 53, 93 S.Ct. 1278, 1307, 36 L.Ed.2d 16, 54 (1973).

In contrast, those states like our own that find education to be a fundamental right apply the higher equal protection standard—a strict scrutiny test—that requires a court to find a compelling state interest to justify any disparate classification.[10] *E.g., Serrano v. Priest,* 18 Cal.3d 728, 557 P.2d 929, 135 Cal.Rptr. 345 (1976), *cert. denied,* 432 U.S. 907, 97 S.Ct. 2951, 53 L.Ed.2d 1079 (1977); *Robinson v. Cahill, supra; Washakie County School Dist. No. 1 v. Herschler,* 606 P.2d 310 (Wyo.), *cert. denied,* 449 U.S. 824, 101 S.Ct. 86, 66 L.Ed.2d 28 (1980). In both *Serrano* and *Herschler,* the courts dealt with statutes that authorized excess or special levies to raise additional funds for public education. There was no constitutional authorization for the levies and both courts concluded that the statutes were unconstitutional on equal protection grounds. Implicit in these cases was the finding that a disproportionate amount of funding was required to be raised locally.

As discussed earlier, W.Va. Const. art. X, § 10 expressly and unqualifiedly authorizes counties to pass excess levies at rates not to exceed 100 percent of the maximum allowable levy rates.[11] Therefore, this question of constitutional construction

arises: To what extent are equal protection principles limited or superseded by the express mandate of W.Va. Const. art. X, § 10?

■ We turn first to the principle that general constitutional provisions are deemed to yield to specific ones. *See generally* 16 C.J.S., *Constitutional Law* § 28 (1984). This principle was discussed and applied in *Lawson v. Kanawha County Court,* 80 W.Va. 612, 92 S.E. 786 (1917), where an injunction was sought to prohibit the completion of a county road. It was contended that the county failed to comply with certain conditions contained in the bond levy that funded the road. The county responded that it was not subject to such conditions in view of the broad police and fiscal powers vested in the counties by W.Va. Const. art. VIII, § 24.[12]

■ We concluded in *Lawson* that the broad grant of powers to the counties must be construed *in pari materia* with the requirements for bonded indebtedness spelled out in W.Va. Const. art. X, § 8. These requirements, detailed and specific, were deemed to limit the more general provisions contained in W.Va. Const. art. VIII, § 24. We summarized this rule in Syllabus Point 5:

"General and indefinite terms of one provision of a Constitution, literally embracing numerous subjects, are impliedly limited and restrained by definite and specific terms of another, necessarily and inexorably withdrawing from the operation of such general terms, a subject which, but for such implied withdrawal, would be embraced and governed by them."

---

**10.** We have applied the two-tier equal protection analysis developed by the United States Supreme Court in a number of our cases. *State ex rel. Longanacre v. Crabtree,* 177 W.Va. 132, 350 S.E.2d 760 (1986); *Myers v. Barte,* 167 W.Va. 194, 279 S.E.2d 406 (1981); *Cimino v. Board of Educ.,* 158 W.Va. 267, 210 S.E.2d 485 (1974).

**11.** For the text of W.Va. Const. art. X, § 10, *see* note 3, *supra.*

**12.** W.Va. Const. art. VIII, § 24, prior to the adoption of the Judicial Reorganization Amend-

ment of 1974, contained this language which was relied upon in *Lawson:*

"[County commissions] shall also, under such regulations as may be prescribed by law, have the superintendence and administration of the internal police and fiscal affairs of their counties, including the establishment and regulation of roads, ways, bridges, public landings, ferries and mills, with authority to lay and disburse the county levies[.]"

This same language is now found in W.Va. Const. art. IX, § 11.

*Lawson* is plainly applicable here. We note that there is no specific "equal protection" clause in our Constitution. We have in the past found equal protection principles implicit in the general language of W.Va. Const. art. III, § 10,[13] *Thomas v. Rutledge,* 167 W.Va. 487, 280 S.E.2d 123 (1981), and in W.Va. Const. art. III, § 17, our "open courts" provision,[14] *e.g., State ex rel. Piccirillo v. City of Follansbee,* 160 W.Va. 329, 233 S.E.2d 419 (1977); *State ex rel. Payne v. Walden,* 156 W.Va. 60, 190 S.E.2d 770 (1972). More recently, in *State ex rel. Longanacre v. Crabtree,* 177 W.Va. 132, 135, 350 S.E.2d 760, 763–64 (1986), we placed our equal protection principles under W.Va. Const. art. VI, § 39, which prohibits the enactment of special legislation:

> "In considering our own equal protection principles under Article VI, Section 39 of the West Virginia Constitution, we have obtained guidance from federal cases interpreting the equal protection mandate of the Fourteenth Amendment to the United States Constitution which is applicable to state actions." (Footnotes omitted).[15]

■ The equal protection mandates of these various provisions of our Constitution are broad and, literally construed, would reach innumerable objects. Thus, they come within *Lawson*'s teaching that requires a broad constitutional precept to be tempered by a more specific one. Here, the language of W.Va. Const. art. X, § 10 authorizing excess levies deals specifically with this subject. It cannot be said from its language that there is any discriminatory classification, as it operates evenly on all property. We find, under *Lawson,* that the excess levy provision does not violate equal protection principles since W.Va. Const. art. X, § 10 expressly authorizes these very levies. Excess levies are withdrawn from the operation and scope of equal protection principles.

■ There is a further constitutional principle that comes into play. It is that a more recent constitutional amendment will prevail over a prior constitutional provision that is in conflict therewith. *See generally* 16 Am.Jur.2d *Constitutional Law* § 103 (1979); 16 C.J.S., *Constitutional Law* § 29 (1984). We note that each of the provisions from which our equal protection jurisprudence was drawn dates from at least the 1872 Constitution. It was not until November, 1958, that W.Va. Const. art. X, § 10, which authorizes excess levies, was added to our Constitution.

This priority-in-time principle was first applied in *Berry v. Fox,* 114 W.Va. 513, 172 S.E. 896 (1934), a case that involved a challenge to a statute that appropriated funds to counties in payment of certain bonded debt for roads and schools. It was contended, in part, that the statute contravened W.Va. Const. art. X, § 6, which prohibits the State from assuming "the debts or liabilities of any county, city, township, corporation or person[.]"

■ We considered in *Berry* whether the absolute bar contained in W.Va. Const. art. X, § 6 was affected by two subsequent Good Roads Amendments or the Tax Limitations Amendment of 1932. The former authorized the Legislature to "assist" monetarily in the construction of a State road system; the latter permitted revenues from specified taxes to be "appropriated as the legislature may provide." We determined

---

**13.** W.Va. Const. art. III, § 10 provides: "No person shall be deprived of life, liberty, or property, without due process of law, and the judgment of his peers."

**14.** W.Va. Const. art. III, § 17 states: "The courts of this State shall be open, and every person, for an injury done to him, in his person, property or reputation, shall have remedy by due course of law; and justice shall be administered without sale, denial or delay."

**15.** In note 5 of *Longanacre,* 177 W.Va. at 136, 350 S.E.2d at 763, in speaking of W.Va. Const. art. VI, § 39, we stated that "other jurisdictions had utilized similar constitutional provisions against special legislation to anchor their state equal protection principle. *E.g., State v. Lewis,* 559 P.2d 630 (Alaska 1977); *Anderson v. Wagner,* 79 Ill.2d 295, 37 Ill.Dec. 558, 402 N.E.2d 560 (1979); *Paul Kimball Hospital, Inc. v. Brick Township Hospital, Inc.,* 86 N.J. 429, 432 A.2d 36 (1981)."

that these constitutional provisions were not in conflict,[16] and stated in Syllabus Point 3:

"A constitutional amendment, as the last word from the people on a subject under consideration, should be given controlling effect where there is irreconcilable conflict between it and other constitutional provisions, but no such effect should be given where it and other provisions of the Constitution may be read together and harmonized without destroying the effect and purpose of any of them."

*Berry* was followed by *State ex rel. Kanawha County Bldg. Comm'n v. Paterno*, 160 W.Va. 195, 233 S.E.2d 332 (1977), which dealt with the power of the State to appropriate to counties and municipalities the revenues derived from a coal severance tax. The tax was passed pursuant to W.Va. Const. art. X, § 6a, a provision added to the Constitution in 1972. The amendment specifically authorized the Legislature to lay and collect taxes for the use of counties and municipalities. The tax statute was challenged as an unconstitutional grant of the State's credit to counties and municipalities. Applying the rule previously stated in *Berry*, we found the statute to be valid. The two constitutional provisions were clearly in conflict on the point in question and the amendment, as "the last word from the people," 160 W.Va. at 203, 233 S.E.2d at 337, was deemed to be controlling.

We find *Berry* and *Paterno* to be dispositive. W.Va. Const. art. X, § 10, in plain words, authorizes the residents of any county to approve by a majority vote the imposition of higher taxes on property in the county for the support of the county's public schools. This authority may be exercised "[n]otwithstanding any other provision of the constitution to the contrary[.]" To the extent that the equal protection mandates of our Constitution would dictate otherwise, they must be deemed to be su-

perseded by W.Va. Const. art. X, § 10, as the last word from the people.

■ We thus conclude, consistently with the foregoing principles of construction, that the authority of the residents of a county to vote for and approve an excess levy for the support of public schools in the county, pursuant to W.Va. Const. art. X, § 10, is not subject to equal protection principles.

**B.**

■ We next consider whether prohibition is a proper remedy in this case. We recently restated the rule for the issuance of a writ of prohibition in the Syllabus of *Williams v. Narick*, 177 W.Va. 11, 350 S.E.2d 11 (1986):

" 'A writ of prohibition shall lie as a matter of right in all cases of usurpation and abuse of power, when the inferior court has not jurisdiction of the subject matter in controversy, or, having such jurisdiction exceeds its legitimate powers.' Syllabus Point 1, *State ex rel. UMWA International Union v. Maynard*, 176 W.Va. 131, 342 S.E.2d 96 (1985)."

*See also State ex rel. United Mine Workers Int'l Union v. Maynard*, 176 W.Va. 131, 342 S.E.2d 96 (1985); *State ex rel. Ayers v. Cline*, 176 W.Va. 123, 342 S.E.2d 89 (1985); *Hechler v. Casey*, 175 W.Va. 434, 333 S.E.2d 799 (1985); *State ex rel. Hamstead v. Dostert*, 173 W.Va. 133, 313 S.E.2d 409 (1984).

■ Quite plainly, the court exceeded its legitimate powers by the entry of an unconstitutional order. While the order does not directly proscribe county excess levies, it does so by indirection. It penalizes counties that presently have excess levies and, if not prohibited, would render impossible the approval of such levies in the future. We, therefore, hold that the supplemental order of June 29, 1987, is properly subject

---

**16.** We note that *Berry* was disapproved of in *Pauley* insofar as it prohibited payment by the State of county school debts. 162 W.Va. at 692 n. 25, 255 S.E.2d at 871 n. 25.

to prohibition and issue an appropriate writ.

## IV.

We deem it appropriate, in view of our decision today, to offer guidance for further development of the *Pauley* case. As discussed more fully above, the focus of equal protection is not merely on the existence of financing disparities. Local excess levies will undoubtedly promote some disparities between counties. These disparities are expressly countenanced by W.Va. Const. art. X, § 10. They represent the initiative of individual counties whose residents are willing to tax themselves to improve the level of local education.

We find the true focus of *Pauley* to be whether the State has complied with its constitutional duty to provide school financing in a manner, and at a level, that is thorough and efficient. This requires an examination of the school financing formula, without consideration of excess levy revenues. There are two pertinent inquiries. First, the formula must be scrutinized facially. Is the basic foundation program, the minimum level of funding guaranteed by the State, constitutionally sufficient to meet the county's education needs? Second, the formula must be examined as it is applied. Is the total funding actually received by the county, including the local share from its regular levy, constitutionally sufficient to meet the county's education needs?

It is particularly the latter inquiry, the application of the formula, that requires further exploration below. One of the issues we identified for remand in *Pauley* was whether the method of appraisal used by individual counties affected their ability to raise tax revenues and to meet their local shares. 162 W.Va. at 712–15, 255 S.E.2d at 880–82. Exhibits appended to the briefs of the parties herein tend to show that property appraisals do not correspond to fair market value and are not uniform in all counties.

We take this opportunity to restate two constitutional commands that relate to property appraisals. First, all property situate in the State must be appraised uniformly in accordance with its value. Value is to be determined by means of a statewide reappraisal of property authorized and implemented by the Legislature. Second, property is to be assessed by the counties, for tax purposes, at 60 percent of its value unless otherwise directed by the Legislature. W.Va. Const. art. X, § 1b.

It appears that a primary cause of the school financing problem may lie with the appraisal system. The statewide reappraisal contemplated by W.Va. Const. art. X, § 1b is, as yet, unrealized.[17] In a 1983 statute, the Legislature provided that the reappraisal process was to be completed by March 1, 1985. W.Va.Code, 11–1A–19. Numerous complaints of errors and misinformation resulted in a flood of appeals, and the Legislature responded with a revised appeals process and a delay in implementation. W.Va.Code, 11–1B–1, *et seq.* Subject to certification, the reappraisal was most recently scheduled to be implemented this year. W.Va.Code, 11–1B–18. We are informed that the reappraisal was, in fact, not implemented as required by the statute.

It will, therefore, be appropriate for the circuit court to consider the extent to which the statewide reappraisal will remedy the financing disparities between counties.[18] To this end, it may be advisable to inquire into the reasons for the delay in implementation of the reappraisal and, if necessary, to order such implementation as soon as practicable.

## V.

For the reasons discussed above, a writ of prohibition is hereby issued to permanently restrain and prohibit enforcement of the June 29, 1987 order of the Kanawha

---

17. The statewide reappraisal amendment was submitted to the voters and approved on November 2, 1982.

18. This issue was expressly reserved by the court in its March 4, 1983 order and was not, therefore, fully developed below.

228

County Circuit Court.[19]

WRIT ISSUED.

---

**19.** We need not, in view of our disposition of these cases, reach the issue whether the county boards of education are indispensable parties to the *Pauley* case.