639 S.E.2d 893

The **BOARD OF EDUCATION OF the COUNTY OF KANAWHA, a Public Corporation, Plaintiff Below, Appellant**

v.

**WEST VIRGINIA BOARD OF EDUCATION, a Public Corporation, and Dr. David Stewart, as Superintendent of Schools of the State of West Virginia, Defendants Below, Appellees.**

No. 33081.

Supreme Court of Appeals of West Virginia.

Submitted Nov. 1, 2006.

Decided Dec. 4, 2006.

Concurring Opinion of Chief Justice Davis Jan. 3, 2007.

James K. Brown, Jackson Kelly, PLLC, Williamsburg, Taunja Willis Miller, Jackson Kelly, PLLC, Martinsburg, for the Appellant.

Darrell V. McGraw, Jr., Attorney General, Barbara H. Allen, Managing Deputy Attorney General, for the Appellees.

MAYNARD, Justice:

The Kanawha County Board of Education, the appellant herein, appeals the December 9, 2005, order of the Circuit Court of Kanawha County that granted summary judgment to the appellees, the West Virginia Board of

Education and its Superintendent, Steven L. Paine,[1] in the appellant's action seeking a declaration that the appellees' method of financing the Kanawha County school system violates the equal protection clause of the State Constitution. After careful consideration of the parties' arguments and the circuit court's order, we reverse the circuit court. We also hold that W.Va.Code § 18–9A–12 (1993), to the extent that it fails to provide that a county school board's allocated state aid share shall be adjusted to account for the fact that a portion of the county school board's local share is required by law to be used to support a non-school purpose, violates equal protection principles because it operates to treat county school boards required by law to provide financial support to non-school purposes less favorably than county school boards with no such requirement.

I.

STATEMENT OF FACTS

The appellant, Kanawha County Board of Education (hereinafter "Kanawha County school board" or "County school board"), operates the public schools of Kanawha County. The appellees, West Virginia Board of Education and its superintendent (hereinafter "State school board"), administer the funding of the public schools of each county according to a financing formula set out in W.Va.Code §§ 18–9A–11 and 18–9A–12.[2] The State

1. When this action was originally brought below, Dr. David Stewart was the State Superintendent of Schools. He has since been succeeded by Steven L. Paine.

2. W.Va.Code § 18–9A–11 (2004) provides, in pertinent part,
 (a) On the basis of each county's certificates of valuation as to all classes of property as determined and published by the assessors ... the State Board shall for each county compute by application of the levies for general current expense purposes ... the amount of revenue which the levies would produce if levied upon one hundred percent of the assessed value of each of the several classes of property contained in the report or revised report of the value, made to it by the Tax Commissioner as follows:
 (1) The State Board shall first take ninety-five percent of the amount ascertained by applying these rates to the total assessed public utility valuation in each classification of property in the county.

(2) The State Board shall then apply these rates to the assessed taxable value of other property in each classification in the county as determined by the Tax Commissioner and shall deduct therefrom five percent as an allowance for the usual losses in collections due to discounts, exonerations, delinquencies and the like. All of the amount so determined shall be added to the ninety-five percent of public utility taxes computed as provided in subdivision (1) of this subsection, and this total shall be further reduced by the amount due each county assessor's office pursuant to the provisions of section eight [§ 11–1C–8], article one-c, chapter eleven of this code *and this amount shall be the local share of the particular county.* (Emphasis added).
W.Va.Code § 18–9A–12(a) (1993) provides, in part:
The allocated state aid share of the county's basic foundation program shall be the difference between the cost of its basic foundation program and the county's local share as deter-

Board applies this formula to provide State financial resources to supplement the financial resources of the State's county school boards.

This financing formula for schools has been summarized by this Court as contemplating,

> a shared responsibility of education costs to be borne by the State and individual counties.

Very broadly, the operation of the formula may be described as follows. First, a county's estimated level of need, or "basic foundation program," is determined. The basic foundation program is the total sum required for each of seven categories of need. viz., professional educators, service personnel, fixed costs, transportation costs, administrative costs, other current expenses and substitute employees, and improvement of instructional programs. W.Va.Code, 18–9A–12.

Second, the county's "local share" must be computed. W.Va.Code, 18–9A–11(a). Local share is the amount of tax revenue which will be produced by levies, at specified rates, on all real property situate in the county. Local share thus represents the county's contribution to education costs on the basis of the value of its real property. State funding is provided to the county in an amount equal to the difference between the basic foundation program and the local share. W.Va.Code, 18–9A–12.

*State ex rel. Boards of Educ. v. Chafin,* 180 W.Va. 219, 221–222, 376 S.E.2d 113, 115–116 (1988) (footnote omitted).

Pursuant to a Special Act passed by the Legislature in 1957, the Kanawha County Board of Education is charged with distributing a part of the proceeds of its annual regular levies to the support of the Kanawha County Public Library. According to this Special Act, in part:

> Sec. 5. *Financing.*—In order to provide for the support, maintenance and operation of the public library hereby created, and any and all branches thereof, the supporting governing authorities shall, upon written request by its board of directors, levy annually as follows within the respective *taxing districts of the governing* authorities, on each one hundred dollars of assessed valuation of the property taxable in the area served by it according to the last assessment for state and county purposes, amounts not exceeding the following amounts for the fiscal year beginning July first, one thousand nine hundred fifty-seven, and for each succeeding fiscal year, as follows: by the board of education of the county of Kanawha, class one, one cent; class two, two cents; class three, four cents; class four, four cents; by the county court of Kanawha County, class one, one cent; class two, two cents; class three, four cents; class four, four cents; and by the city of Charleston, class one, one cent;

mined in section eleven of this article except as provided in subsection (b) of this section.

According to W.Va.Code § 18–9A–12(b), in part:

> The allocated state aid share shall be adjusted in the following circumstances in the following manner. . . .
>
> (1) In those instances where the local share as computed under section eleven of this article is not reflective of local funds available *because the county is under a final court order* to refund or credit property taxes paid in prior years, the allocated state aid share shall be the *county's basic foundation program, minus the* local share as computed under section eleven of this article, plus the amount of property tax the county is unable to collect or must refund due to the final court order. . . .
>
> (2) In those instances where the local share as computed under section eleven of this article is not reflective of local funds available because the county is collecting tax based upon an assessed value which is less than that determined by the tax commissioner in the most

recent published survey of property valuations in the state due to an error in the published survey, which error is certified to by the tax commissioner, the allocated state aid share shall be the county's basic foundation program, minus the local share as computed under section eleven of this article, plus the amount of property tax the county is unable to collect based on differences in the assessed valuation between those in the most recent published survey of valuation and the corrected assessed value actually levied upon by the county. . . .

> (3) In instances where a county is unable to collect property taxes from a taxpayer during *the pendency of any court proceedings, the* allocated state aid share shall be the county's basic foundation program minus the local share as computed under section eleven [§ 18–9A–11] of this article, plus the amount the county is unable to collect as a result of the pending court proceedings as certified by the tax commissioner. . . .

class two, two cents; class four, four cents. Each year the board of directors shall request each of the three governing authorities to levy the same amount on each one hundred dollars of assessed valuation of property of the same class, and the amount of the levy on the respective classes of property shall be in the same ratio as the maximum amount of levy on the said classes of property authorized herein. In addition to the aforesaid amounts which, upon written request by the board, the governing authorities shall levy, each governing authority may support the public library with any other general or special revenues or excess levies. All income realized by the operation of the public library from any sources other than the above levies shall be used by the board of directors for the support and maintenance of the public library.[3] (Footnote added).

Chapter 178, Acts of the Legislature, Regular Session, 1957. The circuit court below found that in fiscal year 2002–2003, $2,209,600.00 of Kanawha County's regular tax levy funds were remitted under the Special Act to the Kanawha County Public Library, and that in fiscal year 2003–2004, the diverted amount was $2,228,070.00.

The problem in this case is that when the State school board calculates the County school board's local share under W.Va.Code § 18–9A–11, for each fiscal year, it includes in the local share the portion of the regular tax levy remitted to the library pursuant to the Special Act. The County school board explains in its brief to this Court that "the effect of this fictitious inflation of the Kanawha Board's Local Share was a *pro tanto* diminution in these amounts in such fiscal years of the Kanawha Board's [state share]. Similar consequences have resulted in past fiscal years and will result in subsequent fiscal years." Thus, the County school board wants the State school board, in computing the amount of the County school board's

State share, to exclude from its local share the portion of regular tax levy proceeds directed to support the county library.

Accordingly, in 2003, the Kanawha County school board filed a complaint for declaratory judgment and injunctive relief against the State school board and its superintendent asking the circuit court to declare that W.Va. Code § 18–9A–11 and related provisions, as interpreted and applied by the State Board, in combination with the Special Act, creates a discriminatory classification of the County school board within the State's public school financing system in violation of the State Constitution's equal protection clause. The County school board also asked the circuit court to permanently enjoin the State school board from including in its calculation of the County school board's local share the tax receipts that are annually diverted to the library pursuant to the Special Act.

By order dated December 9, 2005, the circuit court denied the relief sought by the Kanawha County school board and granted summary judgment on behalf of the State school board. In support of its ruling, the circuit court made findings of fact that,

Notwithstanding the operation of the Kanawha Special Act, the Legislature's refusal to amend the statutes and the Defendant's refusal to interpret the statutes (by rewriting them in effect), the Plaintiff is providing a thorough and efficient education to Kanawha County's students. In doing so, the Plaintiff is able to provide salary supplements to the teachers and to carry over surplus every fiscal year ranging from $6,000,000.00 to $13,000,000.00.

In a county's computation of its local share, West Virginia Code § 18–9A–11(a)(2) permits a deduction of 5% of regular levy funds to cover uncollectibles. This results in a benefit to the Kanawha County Board of Education, because Kanawha

---

**3.** This Court upheld the constitutionality of this Special Act in *Kanawha County Public Library v. County Court*, 143 W.Va. 385, 102 S.E.2d 712 (1958), where we held in the Syllabus that,

Chapter 178, Acts of the Legislature, Regular Session, 1957, establishing the "Kanawha County Public Library" and requiring the County Court of Kanawha County to contrib-

ute to the support thereof, is not invalid as in contravention of the provisions of Section 39, Article VI, or Section 24, Article VIII of the Constitution of this State.

The circuit court indicates in its order that eight other county school boards are subject to special legislative acts that similarly divert regular tax levy proceeds to local public libraries.

County's actual percentage of uncollectibles is lower than the statutory 5%.

Libraries are an aid to education, as evidenced by the fact that in counties not subject to a Special Act, many school districts nonetheless support their public libraries either through direct agreements with their libraries directly or by entering into agreements at the local level to provide a certain portion of funding to the libraries. (Footnote and citations omitted).

In rejecting the county school board's equal protection claim, the circuit court reasoned as follows:

Applying the rational basis test, it is clear that West Virginia Code § 18–9A–11 and § 18–9A–12(b) pass constitutional muster, despite the Legislature's failure to carve statutory "library funding obligations" out of the definition of local share in § 18–9A–11, and/or to add statutory "library funding obligations" to the list of exceptions set forth in § 18–9A–12(b). Libraries are an aid to education .... Thus, if a county is statutorily required to fund its public library system, and is still able to provide a thorough and efficient education, with salary supplements for teachers, a yearly carryover of $6,000,000.00 to $13,000,000.00, and an extra "sock" of money resulting from the fact that the statutory 5% deduction of uncollectibles from local share is higher than the actual percentage experienced, then the Legislature has acted reasonably in spending the state's educational dollars where they are most needed.

The Court finds that the Plaintiff has failed to demonstrate an entitlement to the relief sought in its Complaint. The statutory scheme, W.Va.Code § 18–9A–1 et seq. and particularly § 18–9A–11 and § 18–9A–12(b), may not always make it easy but does make it possible, under the facts and circumstances now existing, for the Kanawha County Board of Education to provide a thorough and efficient education for the county's school students. Despite the fact that the Legislature has not carved out a "library funding" exception to the statutory computation of local share, the Kanawha County Board of Education is not only providing a thorough and efficient education but also carrying over millions of dollars every year.

The Kanawha County school board now appeals the circuit court's order.

## II.

### STANDARD OF REVIEW

■ Because the issue before us is one of law, we review the circuit court's order herein de novo. See Syllabus Point 1, Chrystal R.M. v. Charlie A.L., 194 W.Va. 138, 459 S.E.2d 415 (1995) ("Where the issue on an appeal from the circuit court is clearly a question of law ... we apply a de novo standard of review.").

## III.

### DISCUSSION

■ We start our discussion of the County school board's equal protection claim with this State's equal protection provision. According to the West Virginia Constitution, Article III, § 10, "No person shall be deprived of life, liberty, or property, without due process of law, and the judgment of his peers." This Court has held that "[t]he concept of equal protection of the laws is inherent in article three, section ten of the West Virginia Constitution, and the scope and application of this protection is coextensive or broader than that of the fourteenth amendment to the United States Constitution." Syllabus Point 3, Robertson v. Goldman, 179 W.Va. 453, 369 S.E.2d 888 (1988). We have further explained,

equal protection means the State cannot treat similarly situated people differently unless circumstances justify the disparate treatment. As two commentators have noted, "[t]he equal protection guarantee has nothing to do with the determination of whether a specific individual is properly placed within a classification. Equal protection tests whether the classification is properly drawn." John C. Nowak and Ronald D. Rotunda, Constitutional Law § 14.2, at 570 (4th ed. 1991).

In Cimino v. Board of Education, 158 W.Va. 267, 274–275, 210 S.E.2d 485, 490 (1974), this Court stated the tests used to

determine whether a classification will pass constitutional muster under equal protection:

> Whether a statute or governmental action violates the Equal Protection Clause is a determination made by the application of one of two constitutional tests. The more demanding test relates to statutes which impinge upon sensitive and fundamental rights and constitutional freedoms, such as religion and speech. In order to uphold such a statute, a reviewing court must find that a compelling state interest is served by the classification....
>
> In all other instances, the constitutionality of a statute, challenged under the Equal Protection Clause, is subject to the traditional standard requiring that the state law be shown to bear some rational relationship to legitimate state purposes.... Under this test, the court must consider whether the classification is a rational one based on social, economic, historic or geographic factors; whether the classification bears a reasonable relationship to a proper governmental purpose; and whether all persons within the classes established are treated equally.

*Kyriazis v. University of West Virginia*, 192 W.Va. 60, 67, 450 S.E.2d 649, 656 (1994) (citations omitted).

 First, we agree with the County school board that the circuit court erred in applying the rational basis test instead of the strict scrutiny test in this case. As we explained in *Cimino*, the strict scrutiny test is required when the law or governmental action at issue impinges upon a fundamental right. It is well settled that the right to an education is a fundamental under our State Constitution which provides that "The legislature shall provide, by general law, for a thorough and efficient system of free schools." W.Va. Const., art. XII, § 1. In Syllabus Point 3 of *Pauley v. Kelly*, 162 W.Va. 672, 255 S.E.2d 859 (1979), this Court held that "[t]he mandatory requirements of 'a thorough and efficient system of free schools' found in Article XII, Section 1 of the West Virginia Constitution, make education a fundamental, constitutional right in this State." The Legislature's constitutional mandate to provide a thorough and efficient education includes, at a minimum, the requirement that the State's formula for funding county school systems be applied in an equal or uniform manner. *See Pauley*, 162 W.Va. at 716, 255 S.E.2d at 882 (explaining that "our thorough and efficient constitutional mandate requires something more than a mere equality of educational funding to the counties.").

 We also held in *Pauley* that "[b]ecause education is a fundamental, constitutional right in this State, under our Equal Protection Clause any discriminatory classification found in the State's educational financing system cannot stand unless the State can demonstrate some compelling State interest to justify the unequal classification." Syllabus Point 4, *Pauley*, *supra*. In addition,

> [I]f the State takes some action which denies or infringes upon a person's fundamental right to an education, then strict scrutiny will apply and the State must prove that its action is necessary to serve some compelling State interest. Furthermore, any denial or infringement of the fundamental right to an education for a compelling State interest must be narrowly tailored. *Phillip Leon M. v. Greenbrier County Board of Education*, 199 W.Va. 400, 409, 484 S.E.2d 909, 918 (1996) (McHugh, J., concurring, in part, and dissenting, in part) (citations omitted). *W.Va. Const.* art. XII, section 1.

Syllabus Point 2, *Cathe A. v. Doddridge County Bd. of Educ.*, 200 W.Va. 521, 490 S.E.2d 340 (1997). Finally, this Court has indicated, and we now hold, that "a statute that creates a lack of uniformity in the State's educational financing system is subject to strict scrutiny, and this discrimination will be upheld only if necessary to further a compelling state interest." *State ex rel. Bd. of Educ. v. Bailey*, 192 W.Va. 534, 538, 453 S.E.2d 368, 372 (1994) (emphasis, citations, and internal quotation marks omitted).

 When we apply the strict scrutiny test to the present facts, we can find no compelling reason that justifies treating those school boards differently that are charged by law with applying a portion of their local share to support a non-school pur-

pose such as a public library. Clearly, the end result of such unequal treatment is that county school boards charged by law with diverting a portion of their local shares to support non-school purposes have less funds from regular tax levies to expend directly on public schools. Simply put, the more than 2.2 million dollars directed each year to the support of the library is money taken from the support of school children in the classrooms of Kanawha County schools. This, in turn, potentially impinges on a school board's ability to provide a thorough and efficient education to its students.[4]

Accordingly, we now hold that W.Va.Code § 18–9A–12 (1993), to the extent that it fails to provide that a county school board's allocated state aid share shall be adjusted to account for the fact that a portion of the county school board's local share is required by law to be used to support a non-school purpose, violates equal protection principles because it operates to treat county school boards required by law to provide financial support to non-school purposes less favorably than county school boards with no such requirement.

Having found that W.Va.Code § 18–9A–12 is constitutionally deficient, we believe that the Legislature must take corrective action by amending the applicable statutes as provided in this opinion. However, because this Court believes that a period of time will be necessary for the Legislature to take the necessary steps to amend the statute, we will do as the State school board suggests and defer entry of a final order to accommodate a legislative solution. Therefore, the effect of this decision will be stayed until the beginning of the next fiscal year on July 1, 2007.

## IV.

## CONCLUSION

For the reasons set forth above, we find that W.Va.Code § 18–9A–12 is unconstitutional and, accordingly, we reverse the December 9, 2005, order of the Circuit Court of Kanawha County.

Reversed.

ALBRIGHT, Justice, dissenting:

While not directly striking down the Special Act[1] that has mandated the diversion of a portion of regular tax levy receipts collected in Kanawha County for the support of the Kanawha County Public Library for almost fifty years, the majority has inflicted upon the public library system a serious and unnecessary blow. In the guise of protecting the fundamental right of education,[2] the majority has chosen a course of action that will have long-term detrimental effects[3] on the public library systems throughout this state—systems that are undisputedly beneficial to the students and citizens of this state

---

4. Having found no compelling reason for the unequal treatment, it is not necessary for us to address whether the compelling state interest is narrowly tailored.

1. Chapter 178, Acts of the Legislature, Regular Session, 1957.

2. I say this because the record is *completely* devoid of any evidence that the constitutionally required "thorough and efficient" education is not being provided. *See Pauley v. Kelly,* 162 W.Va. 672, 255 S.E.2d 859 (1979); W.Va. *Const.,* art. XII, § 1. Appellant's witnesses in this case concede that Kanawha County students are receiving a "thorough and efficient" education. And the finding by the trial court that Appellant is able "to carry over surplus every fiscal year ranging from $6,000,000.00 to $13,000,000.00" certainly refutes any suggestion that the funds being diverted to the public library are contributing to a funding crisis.

3. Because the funds available for education-related purposes must be legislatively appropriated, the effect of the majority's decision in forcing the Legislature's collective hand to credit the eight counties that have funding arrangements similar to Kanawha County whereby a portion of their education dollars is diverted to public libraries is that there will be a reduction in funds available to the forty-six counties that do not have such systems in place, absent a corresponding increase in overall education appropriations. Consequently, those forty-six counties will indirectly be paying for the library systems in the nine counties where education funds are diverted by law to public libraries. A further downside to the majority's directive is that those counties who voluntarily contribute funds to their respective public library systems may no longer have the funds available for such contributions due to the reduction of their piece of the funding pie that results from giving credits to the nine counties with such diversionary funding mechanisms in place.

and that are clearly education-related in nature.

With absolutely no evidence in the record of this case to indicate that the Constitutional standard of providing a "thorough and efficient system of free schools"[4] has been negatively affected by virtue of the long-standing arrangement of distributing a portion of the Kanawha County's annual regular levies for the benefit of the public library system—an arrangement that has been found not to violate our Constitution on two separate occasions by this Court[5]—the Court has wrongly inserted itself into a Legislatively-determined funding structure. Had there been evidence presented which demonstrated that this state's educational system was in peril as a direct result of this lawful diversion of funds, the majority's actions might begin to be understandable. But, as it currently stands, the majority has simply made a shortsighted policy decision that libraries are not deserving of public education funds.

Through its action, the majority has effectively adopted the position that libraries are not to be valued and recognized for the critical and correlative nexus they have to the education process. Virtually every school child at some point in their state-mandated school attendance is required as part of his or her educational experience to utilize the varied resources that only a library can provide. Such materials necessarily include encyclopedias; atlases; CD's; DVD's; as well as the voluminous published works of fiction and non-fiction. While some people prefer to downplay the significance of actual books given the presence of the internet, I respond by stating that for many people in the rural areas of this state the libraries are often the only source of computer access for those people. In addition, I observe that the internet simply cannot replace the many benefits that a public library provides to its patrons both in terms of physical access to documents and also in terms of broadening an individual's perception and understanding of his or her place in the world by means of exposure to information and events. There is simply no end to the benefits that a public library offers to the citizens of this state, initially extended at the pre-school level, continuing through the school years, and enduring throughout adulthood. Without question, the public library enhances every community in which it is situated through services that are both cultural and educational in nature.

Lest the origins of the extensive public library system that currently exists throughout this country and the importance of permanently securing funding for such invaluable institutions be forgotten, we should recall the life of steel magnate and philanthropist Andrew Carnegie. When he arrived in this country in 1848 as a poor immigrant, he was denied access to the so-called public library because he did not have the funds to pay the annual fee required to use the library. Recognizing the injustice of the situation, he wrote a letter to the editor of the Pittsburgh Dispatch in 1853, arguing that poor young people should be given free access to libraries so that they could improve themselves. The director of Andrew Carnegie's local library read the letter, and it persuaded him to change the rule. After becoming one of the richest men in the world, Andrew Carnegie spent the rest of his life giving his fortune away to charity. Among his many charitable acts was the construction of almost 3,000 libraries across the country. For every library he funded, he required that the town set aside a certain amount of tax funds to keep it running in perpetuity. He also required that many libraries inscribe phrases like "Free Library" or "Free to the People" over the entrance, so that the libraries would always remain free.

While perhaps overlooked by the majority, Carl Sagan aptly articulated the value of the public library to society:

> The library connects us with the insights and knowledge, painfully extracted from Nature, of the greatest minds that ever were, with the best teachers, drawn from the entire planet and from all of our history, to instruct us without tiring, and to

4. W.Va. *Const.* art. XII, § 1.

5. *See Kanawha County Public Library v. County Court,* 143 W.Va. 385, 102 S.E.2d 712 (1958); *accord Hedrick v. County Court of Raleigh County,* 153 W.Va. 660, 172 S.E.2d 312 (1970).

inspire us to make our own contribution to the collective knowledge of the human species. ... I think the health of our civilization, the depth of our awareness about the underpinnings of our culture and our concern for the future can all be tested by how well we support our libraries.

Carl Edward Sagan, *Cosmos,* 282 (1980). Because the majority has proceeded down a path that threatens the funding structure for public libraries and clearly devalues such vital institutions, I must respectfully dissent.

I am authorized to state that Justice STARCHER joins in this separate opinion.

STARCHER, Justice, dissenting:

Unfortunately, the majority opinion will gut public library funding not only in Kanawha County, but also in Berkeley, Hardy, Harrison, Ohio, Raleigh, Tyler, Upshur, and Wood Counties, all of which benefit from similar laws. It will also likely gut library funding in those counties that voluntarily (without a specific legislative statute) provide funding for their community libraries.

The majority opinion overturns settled law that has supported libraries in multiple counties since as early as 1933. The majority opinion overturns a wise decision by Judge Charles King, an experienced circuit judge. And the majority opinion overturns clear statutes that reflect the will of the legislature, without a shred of support in the record. Accordingly, I dissent.

This Court courageously stepped into the swamp of educational funding in *Pauley v. Kelly,* 162 W.Va. 672, 255 S.E.2d 859 (1979). Why?

Because some West Virginia children, simply because of where they happened to live, were going to school in firetraps, had no school supplies, etc. This Court insisted that these children could not be denied their basic constitutional right to a decent educational experience.

Since the *Pauley* decision, this Court has further recognized that while we can assure that a "floor" of educational quality is reached for all of our children, we cannot manage West Virginia's entire school system. That is the task of the legislature, the executive branch, and local school bodies—not the courts'.

Does the Legislature's requiring some counties to spend some of their levy funds to support libraries adversely and substantially impact the thoroughness and efficiency of educational services afforded to the children in those counties? I think not.

However, the majority opinion's answer to this question is: "Well, it's possible that it could." What the majority actually says is: "[spending levy money on libraries could] *potentially impinge* on a school board's ability to provide a thorough and efficient education to its students." Thus, under the majority's approach, an entirely *speculative* injury to educational services in certain counties justifies overruling settled statutes and clear legislative choices. Moreover, since *public libraries are an integral part of any sound educational system* providing educational monies for their support is educationally sound.

This Court has never taken such an absurd position as the majority opinion does. The broad-sweeping approach taken by the majority would justify a constitutional challenge to every educationally-related political decision such as where to locate a school, what courses to fund, or how to spend monies on libraries. Whatever the motive, the constitutional analysis in the majority's foray into micro-managing the State's school system is a mess, and the result is just plain wrong.

I am authorized to state that Justice ALBRIGHT joins in this separate opinion.

DAVIS, Chief Justice, concurring:
(Filed January 3, 2007)

One of the most fundamental rights granted to the children of this State is the right to an education. To this end, the West Virginia Constitution specifically directs that "[t]he legislature shall provide, by general law, for a thorough and efficient system of free schools." W. Va. Const. art. XII, § 1. *See also* Majority opinion, at Syl. pt. 2 (" 'The mandatory requirements of "a thorough and efficient system of free schools" found in Article XII, Section 1 of the West Virginia Constitution, make education a fundamental, constitutional right in this State.' Syllabus Point 3, *Pauley v. Kelly,* 162 W.Va. 672, 255 S.E.2d 859 (1979)."). Consequently, the Leg-

islature must facilitate the delivery of educational services to this State's schoolchildren through its acts of legislation and may not enact laws which interfere therewith absent some compelling justification. *See* Majority opinion, at Syl. pt. 3 (" 'Because education is a fundamental, constitutional right in this State, under our Equal Protection Clause any discriminatory classification found in the State's educational financing system cannot stand unless the State can demonstrate some compelling State interest to justify the unequal classification.' Syllabus Point 4, *Pauley v. Kelly*, 162 W.Va. 672, 255 S.E.2d 859 (1979)."). *See also* Majority opinion, at Syl. pt. 5 (" ' "[I]f the State takes some action which denies or infringes upon a person's fundamental right to an education, then strict scrutiny will apply and the State must prove that its action is necessary to serve some compelling State interest. Furthermore, any denial or infringement of the fundamental right to an education for a compelling State interest must be narrowly tailored." *Phillip Leon M. v. Greenbrier County Board of Education*, 199 W.Va. 400, 409, 484 S.E.2d 909, 918 (1996) (McHugh, J., concurring, in part, and dissenting, in part) (citations omitted). *W. Va. Const.* art. XII, section 1.' Syllabus Point 2, *Cathe A. v. Doddridge County Bd. of Educ.*, 200 W.Va. 521, 490 S.E.2d 340 (1997)."). The statutory law at issue in this case simply does not pass this constitutional test and, thus, must receive a failing grade. The majority has astutely recognized this aberration; the dissenters have not.

In their dissenting opinions, my colleagues stray from the question brought before the Court, writing treatises which attack the alleged effect the majority's opinion will have on public libraries statewide instead of appreciating the hindrance to fundamental constitutional educational opportunities that would undoubtedly continue if the majority had, as hoped by the dissenters, left well enough alone. The viability of public libraries, however, is neither the issue presented for resolution in this case nor the reason for or result of the decision reached by the majority of the Court. The question that was brought for our consideration and decision was, simply, whether W. Va.Code § 18–9A–12 (1993) (Repl. Vol. 2003) is constitutional when a county school board that is legislatively required to use a portion of its local share funding to support a non-school purpose does not receive a corresponding adjustment of its allocated state aid share to account for such mandatory non-school expenditure. In short, the majority concluded that because the schools attended by children in the Counties of Kanawha, Berkeley, Hardy, Harrison, Ohio, Raleigh, Tyler, Upshur, and Wood did not receive the full amount of educational dollars to which they were entitled, because a portion of said monies had been legislatively diverted to fund the public libraries in those locales, the pupils in those counties were not receiving the education that had been constitutionally guaranteed to them. Applying the test enunciated by this Court nearly thirty years ago in *Pauley*, the majority determined that, in the absence of a compelling reason for this differentiation in funding, the schoolchildren of these nine counties should be receiving the same educational opportunities as those enjoyed by the schoolchildren in the State's other forty-six counties. Because the majority has correctly interpreted and applied the law to safeguard the fundamental constitutional right to an education of *every* child in this State, I concur with the opinion of the Court.