IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

Spring 2024 Term

FILED

March 15, 2024

released at 3:00 p.m.
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

_____

No. 23-691

_____

THE BOARD OF EDUCATION OF THE COUNTY OF CABELL,
Respondent Below, Petitioner,

v.

THE CABELL COUNTY PUBLIC LIBRARY and THE GREATER HUNTINGTON
PARK AND RECREATION DISTRICT,
Petitioners Below, Respondents.

_____

Appeal from the Circuit Court of Cabell County
The Honorable Gregory L. Howard, Judge
Case No. 23-C-339

REVERSED AND REMANDED WITH INSTRUCTIONS

_____

Submitted: February 20, 2023
Filed: March 15, 2024

Kenneth E. Webb, Jr., Esq.
Joshua A. Cottle, Esq.
William M. Lorensen, Esq.
BOWLES RICE LLP
Charleston, West Virginia
Counsel for the Petitioner

Marc E. Williams, Esq.
Randall L. Saunders, Esq.
Thomas M. Hanock, Esq.
Alexander C. Frampton, Esq.
NELSON MULLINS RILEY &
SCARBOROUGH LLP
Huntington, West Virginia

D. Martin Warf, Esq.
NELSON MULLINS RILEY &
SCARBOUGH LLP
Raleigh, North Carolina

Dennis C. Taylor, Esq.
Debra C. Price, Esq.
TAYLOR CONWAY PRICE PLLC
Huntington, West Virginia
Counsel for the Respondents

JUSTICE WOOTON delivered the Opinion of the Court.

**SYLLABUS BY THE COURT**

1. "'The constitutionality of a statute is a question of law which this Court reviews *de novo.*' Syl. Pt. 1, *State v. Rutherford*, 223 W. Va. 1, 672 S.E.2d 137 (2008)." Syl. Pt. 2, *State v. Connor*, 244 W. Va. 594, 855 S.E.2d 902 (2021).

2. "'In considering the constitutionality of a legislative enactment, courts must exercise due restraint, in recognition of the principle of the separation of powers in government among the judicial, legislative and executive branches. Every reasonable construction must be resorted to by the courts in order to sustain constitutionality, and any reasonable doubt must be resolved in favor of the constitutionality of the legislative enactment in question. . . .' Syllabus Point 1, *Appalachian Power Co. v. Gainer,* 149 W.Va. 740, 143 S.E.2d 351 (1965)." Syl. Pt. 2, in part, *Hartley Hill Hunt Club v. Cnty. Comm'n of Ritchie Cnty.,* 220 W.Va. 382, 647 S.E.2d 818 (2007).

3. "Because education is a fundamental, constitutional right in this State, under our Equal Protection Clause any discriminatory classification found in the State's educational financing system cannot stand unless the State can demonstrate some compelling State interest to justify the unequal classification." Syl. Pt. 4, *Pauley v. Kelly*, 162 W. Va. 672, 255 S.E.2d 859 (1979).

i

4.        To the extent that Chapter 207 of the Acts of the Legislature, Regular Session, 1967, and Chapter 187 of the Acts of the Legislature, Regular Session, 2011, require the Board of Education of the County of Cabell, West Virginia, to include funding for the Cabell County Public Library and the Greater Huntington Park and Recreation District, respectively, on its excess levy proposals, while the boards of fifty-three other counties are free to seek voter approval of excess levy funding without such restriction, the Acts violate the equal protection guarantees of the West Virginia Constitution, article III, section 10, and are thus unenforceable.

**WOOTON, Justice:**

The petitioner, The Board of Education of the County of Cabell ("the Board"), appeals from the December 1, 2023, order of the Circuit Court of Cabell County, West Virginia, granting The Cabell County Public Library's ("the Library") and The Greater Huntington Park and Recreation District's ("the Park District") (collectively "the respondents"), petition for a writ of mandamus and motion for judgment on the pleadings. The circuit court's rulings were based upon its conclusion that Chapter 207 of the Acts of the Legislature, Regular Session, 1967 ("the Public Library Special Act") and Chapter 187 of the Acts of the Legislature, Regular Session, 2011 ("the Park District Special Act") (collectively "the Special Acts"),[1] which respectively require the Board to provide funding for the respondents through special and excess levies, are constitutional because they "do not infringe upon the fundamental right of the children of Cabell County to an education."[2]

Upon careful review of the parties' briefs and oral arguments, the appendix record, and the relevant law, we reverse the judgment of the circuit court and remand for that court to enter an order dismissing the respondents' Verified Petition for a Writ of Mandamus, Declaratory Relief, and Injunctive Relief.

---

[1] The Park District Special Act reenacted an earlier version found at Chapter 194 of the Acts of the Legislature, Regular Session, 1983.

[2] *See* Syl. Pt. 3, *Pauley v. Kelly*, 162 W. Va. 672, 255 S.E.2d 859 (1979) (discussed *infra* in detail).

## I. Facts and Procedural Background

On March 9, 1967, the West Virginia Legislature passed the Public Library Special Act for the stated purpose, inter alia, of "provid[ing] a stable method of financing the operation of [the Cabell County Public Library]." 1967 W. Va. Leg. Acts, ch. 207, Reg. Sess. To effectuate this purpose, the Public Library Special Act requires the Board to "provide funds available to the board through special and excess levies," such funds levied at specific rates for specific classes of property during specific five-year periods in which a levy is in effect.[3] *Id.* On April 5, 2011, the Legislature reenacted and passed the Park District Special Act, which requires five different governing authorities to provide for maintenance and operation of the Park District: the Cabell County Commission, the Wayne County Commission, the Board, the City of Huntington, and the Town of Milton. 2011 W. Va. Leg. Acts, ch. 187, Reg. Sess. With specific reference to the Board, the Park District Special Act requires that it "shall provide funds available to the board through special and excess levies for the first year of the act and annually thereafter[,]" again at specific rates for specific classes of property during specific five-year periods.[4] *Id.*

---

[3] It is important to note that this mechanism for funding the Library is not exclusive under the Act, as it permits the Cabell County Commission to "support the public library with any other general or special revenues or excess levies." *See* 1967 W. Va. Leg. Acts, ch. 207, Reg. Sess.

[4] As is the case in the Library Special Act, the Park District Special Act permits the Cabell County Commission, the Wayne County Commission, the City of Huntington, and the Town of Milton, to "support the Park District with any other general or special revenues or excess levies." *See* 2011 W. Va. Leg. Acts, ch. 187, Reg. Sess.

On May 18, 2018, Cabell County voters approved the Board's excess levy proposal for fiscal years beginning July 1, 2020, to July 1, 2025. The proposal included $1,471,869.00 annually for the Library and $455,229.00 annually for the Park District, figures which were based on estimated revenue from the relevant tax rates specified by the Special Acts. The ballot presented to the voters provided, in relevant part, that this was an

> [e]lection to authorize additional levies for the fiscal years beginning July 1, 2020, July 1, 2021, July 1, 2022, July 1, 2023 and July 1, 2024, in the total amount of $24,128,149.00 annually for the purpose of paying the current expenses of The Board of Education of the County of Cabell, for the following purposes:
>
> . . . .
>
> > Cabell County Public Library – The operation of the Cabell County Public Library as required by Section 5, Chaptr 207, of the 1967 Acts of the West Virginia Legislature - $1,471, 869.00
> >
> > Greater Huntington Park and Recreation District – The operation of the Greater Huntington Park and Recreation District as required by Section 7, Chapter 194, of the 1983 Acts of the West Virginia Legislature - $455,229.00
>
> . . . .
>
> In the event The Board of Education of the County of Cabell shall obtain additional money by grant or otherwise from the state or federal government, or from any agency of either, or from any other sources, for the purposes aforesaid, levy monies specified for these purposes may be used for the general operation of the school system. The additional levies shall be on Class I property 22.95¢; on Class II property, 45.90¢; on Class III property 91.80¢; on Class IV property, 91.80¢, for each tax year that property tax revenues are not projected.

The excess levy was passed by the citizens of Cabell County. Thereafter, for the first three of the subject fiscal years the Board paid the respondents the amounts specifically approved by the voters, plus an "equalization" payment representing the difference between the amounts the relevant tax rates had been estimated to generate for the respondents, i.e., the amounts shown on the ballot, and the amounts actually assessed and collected over the course of each fiscal year. However, the Board did not make any equalization payments for fiscal year 2024 and informed officials from the Library and the Park District that it would not make such payments for fiscal year 2025. Additionally, because the Board had determined that its funding needs for the upcoming five fiscal year periods, fiscal years 2026-2030, would exceed its maximum levying capacity under the legislatively determined rates,[5] it informed the respondents of its intent to reduce the funding sought for the Library to $195,089.00 annually and to eliminate funding for the Park District altogether in the excess levy proposal that was to be placed on the ballot and voted upon during the 2024 primary election.

---

[5] It is important to note that the Board does not have the option of increasing the total amount it seeks through passage of an excess levy in order to cover funding for the Library and Park District, because the West Virginia Constitution, article X, section 10, limits the amount sought in an excess levy to one hundred percent of the "maximum rates authorized and allocated by law for tax levies on the several classes of property[.]" *Id. See infra* discussion.

On September 14, 2023, the respondents filed a petition for a writ of mandamus, as well as declaratory and injunctive relief, in the Circuit Court of Cabell County, seeking restoration of the equalization payments withheld and to be withheld, and requiring the Board to put library and parks funding on the upcoming excess levy proposal. In opposition, the Board contended that the Special Acts are unconstitutional pursuant to this Court's resolution of a closely analogous issue in *Kanawha County Public Library Board v. Board of Education of County of Kanawha* ("*Board II*"), 231 W. Va. 386, 745 S.E.2d 424 (2013). Following briefing and argument, the circuit court granted the respondents' request for mandamus relief and their motion for judgment on the pleadings. The court found that the decision in *Board II*, which invalidated Special Acts requiring county school boards in Berkeley, Hardy, Harrison, Kanawha, Ohio, Raleigh, Tyler, Upshur, and Wood Counties to fund public libraries, does not apply to this case because here, the Board is not faced with what we deemed to be the Hobson's choice given to the *Board II* counties of "pay[ing] their respective 'Special Act' mandatory library funding obligations from their discretionary retainage[6] *or* transfer[ring] the obligation to their excess levies[.]" *Board II*, 231 W. Va. at 389, 745 S.E.2d at 428, Syl. Pt. 12, in part (emphasis added). In the instant case, the circuit court reasoned, because funding for the respondents comes *solely* from the Board's excess levy funds pursuant to the Special Acts, "[n]either [Act] affects the funding that satisfies the requirement that the children of Cabell

---

[6] "Discretionary retainage" was defined as "the amount by which the regular school board levies exceeds [sic] the local share." *Board II*, 231 W. Va. at 392, 745 S.E.2d at 430. *See infra* note 14.

County receive a constitutionally adequate education." Further, the court found that "pure excess levies like those funding [the respondents]" were not subject to an equal protection challenge in any event, citing *State ex rel. Boards of Education of the Counties of Upshur v. Chafin*, 180 W. Va. 219, 376 S.E.2d 113 (1988).

The Board appealed, and this Court set an expedited schedule for briefing, argument, and decision. On February 21, 2024, we issued an order reversing the December 1, 2023, order of the circuit court.[7]

## II. Standard of Review

It is well established that "'[t]he constitutionality of a statute is a question of law which this Court reviews *de novo.*' Syl. Pt. 1, *State v. Rutherford*, 223 W. Va. 1, 672 S.E.2d 137 (2008)." Syl. Pt. 2, *State v. Connor*, 244 W. Va. 594, 855 S.E.2d 902 (2021). In our review, we are guided by the principle that

> "[i]n considering the constitutionality of a legislative enactment, courts must exercise due restraint, in recognition of the principle of the separation of powers in government among the judicial, legislative and executive branches. Every reasonable construction must be resorted to by the courts in order to sustain constitutionality, and any reasonable doubt must be resolved in favor of the constitutionality of the legislative enactment in question. . . ." Syllabus Point 1, *Appalachian Power Co. v. Gainer,* 149 W.Va. 740, 143 S.E.2d 351 (1965)."

---

[7] Given the time constraints surrounding the Court's decision, the order reversing indicated that this detailed opinion would follow in due course.

Syl. Pt. 2, in part, *Hartley Hill Hunt Club v. Cnty. Comm'n of Ritchie Cnty.,* 220 W.Va. 382, 647 S.E.2d 818 (2007).

### III. Discussion

The Board contends that the Special Acts, insofar as they require that funding for the Library and the Park District be a part of the Board's excess levy proposal, violate the equal protection clause of West Virginia Constitution, article III, section 10. *See State ex rel. Harris v. Calendine*, 160 W. Va. 172, 179 n.3, 23 S.E.2d 318, 324 n.3 (1977) ("In the continuously evolving tradition of Anglo-American common law there can be no fixed definition of due process of law, which is an inherently elusive concept; nevertheless, it is apparent that due process of law under the West Virginia Constitution contains an equal protection component the scope and application of which are coextensive or broader than the equal protection clause of the Fourteenth Amendment to the United States Constitution.").[8] Because the respondents contend, and the circuit court so held, that Special Acts of the Legislature pertaining to educational funding are not subject to equal protection analysis pursuant to this Court's decision in *Chafin*, we address this question as a threshold issue. 180 W. Va. at 220, 376 S.E.2d at 114, Syl. Pt. 3.

---

[8] This Court subsequently elevated the concept set forth in *Harris* into a syllabus point. *See* Syl. Pt. 3, *Robertson v. Goldman*, 179 W. Va. 453, 369 S.E.2d 888 (1988) ("The concept of equal protection of the laws is inherent in article three, section ten of the West Virginia Constitution, and the scope and application of this protection is coextensive or broader than that of the fourteenth amendment to the United States Constitution.").

The *Chafin* case was a successor to this Court's seminal decision in *Pauley v. Kelly,* 162 W.Va. 672, 255 S.E.2d 859 (1979), wherein we held in syllabus point three that "[t]he mandatory requirements of 'a thorough and efficient system of free schools' found in Article XII, Section 1 of the West Virginia Constitution, make education a fundamental, constitutional right in this State," and in syllabus point four that "[b]ecause education is a fundamental, constitutional right in this State, under our Equal Protection Clause any discriminatory classification found in the State's educational financing system cannot stand unless the State can demonstrate some compelling State interest to justify the unequal classification." 162 W. Va. at 672, 255 S.E.2d at 861, Syl. Pts. 3 & 4. In *Chafin*, we were faced with the issue of whether such a "discriminatory classification" existed between counties having excess levies and those without such levies, and if so, what if any remedy was available to the latter. The circuit court found that there was indeed such a discriminatory classification, and that the excess levy provisions of the West Virginia Constitution, article X, section 10[9] were violative of equal protection principles in that

---

[9] West Virginia Constitution, article X, section 10 provides:

> Notwithstanding any other provision of the Constitution to the contrary, the maximum rates authorized and allocated by law for tax levies on the several classes of property *for the support of public schools* may be increased in any school district for a period not to exceed five years, and in an amount not to exceed one hundred percent of such maximum rates, if such increase is approved, in the manner provided by law, by at least a majority of the votes cast for and against the same.

8

"dependence on county funds, particularly excess levies, promoted unequal treatment of students in poor and wealthy counties." *Chafin*, 180 W. Va. at 221, 376 S.E.2d at 115. The court did not immediately adopt a plan for implementing its decision, in order to facilitate what a special master had proposed as a legislative remedy: adoption of a constitutional amendment to authorize a statewide excess levy. *Id*. at 223, 376 S.E.2d at 117. Ultimately, the Legislature adopted such an amendment, which was submitted to the voters in a special election held on March 5, 1988. The statewide excess levy failed. *Id*. Thereafter, the court issued a supplemental order imposing its own remedy:

> a sum equal to 20 percent of each county's excess levy revenues would be withheld from State school funding in fiscal year 1988-89. The sums withheld were to be increased by an additional 20 percent in each of the next four fiscal years. These sums were to be distributed to other counties "on an equitable basis prescribed by the court."

*Id*. The State Tax Commissioner and the State Auditor appealed, and this Court reversed, determining that

> W. Va. Const. art. X, § 10, in plain words, authorizes the residents of any county to approve by a majority vote the imposition of higher taxes on property in the county for the support of the county's public schools. This authority may be exercised "[n]otwithstanding any other provision of the constitution to the contrary [.]" To the extent that the equal protection mandates of our Constitution would dictate otherwise, they must be deemed to be superseded by W.Va. Const. art. X, § 10, as the last word from the people.

180 W. Va. at 226, 376 S.E.2d at 120.

---

(Emphasis added).

9

Further, and of specific relevance to the issue raised by the respondents, we concluded in *Chafin* that under *Lawson v. Kanawha County Court,* 80 W.Va. 612, 92 S.E. 786 (1917), "the excess levy provision does not violate equal protection principles since W.Va. Const. art. X, § 10 expressly authorizes these very levies. *Excess levies are withdrawn from the operation and scope of equal protection principles.*" *Id*. at 225, 376 S.E.2d at 119 (emphasis added). Based on the cited language, the respondents claim that any issues involving excess levies are insulated from equal protection review as a matter of law. We disagree. First, we note that this broad proposition was implicitly rejected in *State ex rel. Board of Education for County of Grant v. Manchin*, 179 W. Va. 235, 366 S.E.2d 743 (1988), where we held in syllabus point three that

> *W. Va. Code,* 18A-4-5 [1985], to the extent that it fixes a county's entitlement to state equity funding based upon whether an excess levy was in effect in that particular county on January 1, 1984, and continues to limit that county's funding to the specific amount awarded on January 1, 1984, despite the fact that the county's voters subsequently rejected continuation of the levy at the polls, violates equal protection principles because such a financing system operates to treat counties which never passed excess levies more favorably than those which had excess levies in effect on January 1, 1984, but failed to renew them. *W.Va. Const.* art. III, §§ 10 and 17.

*Manchin*, 179 W. Va. at 235-36, 366 S.E.2d at 743-44, Syl. Pt. 3. Second, the language in *Chafin* upon which the respondents rely is inextricably tied to the particular facts and the specific issue presented in that case: whether West Virginia Constitution, article III, section 10 effectively trumps West Virginia Constitution, article X, section 10. In this regard, the only relevant syllabus point in *Chafin* states simply that "[t]he authority of the residents of

10

a county to vote for and approve an excess levy for the support of public schools in the county, pursuant to W.Va. Const. art. X, § 10, is not subject to equal protection principles." 180 W. Va. at 220, 376 S.E.2d at 114. In contrast, the instant case poses no challenge to the validity of West Virginia Constitution, article X, section 10, and has nothing whatsoever to do with the rights of citizens to vote for or against an excess levy. Rather, the Board has challenged the constitutionality of the Special Acts, which impose specific funding requirements in the excess levy proposals of two counties' boards of education while the remaining fifty-three boards are subject to no such requirements. Unlike *Chafin*, which exempted the excess levies in that case from equal protection principles insofar as they related to the disparity between counties that had no excess levies and those that did, here the disparity relates to all counties and how they are permitted to spend excess levy funds. Thus, the respondents cannot rely on *Chafin* to totally forestall an equal protection challenge to the Special Acts at issue herein.

In the instant case, the circuit court agreed with the respondents that the Special Acts are not subject to an equal protection challenge, but on a slightly different ground: that "pursuant to *Chafin*, while excess *levies* may result in a disparity of funding between counties, such excess levies are not entitled to equal protection attack because of an 'absence of State action, which foreclose[s] the funding disparities from an equal protection challenge.'"[10] While we agree with the circuit court's formulation of one of the

_____

[10] *See Board II*, 231 W. Va. at 404, 745 S.E.2d at 442.

11

legal principles underpinning the decision in *Chafin*, we disagree that *Chafin* applies in this case because the two Special Acts at issue here – Special Acts that impose mandatory funding requirements on the Board's excess levy proposals in Cabell County, leaving the boards of fifty-three other counties free to seek voter approval of excess levy funding for whatever purposes they deem proper and necessary – clearly constitute "State action." *See generally Crawford v. W. Va. Dep't of Corr.-Work Release*, 239 W. Va. 374, 381, 801 S.E.2d 252, 259 (2017) (quoting Syl. Pt. 2, *Israel by Israel v. W. Va. Secondary Sch. Activities Comm'n*, 182 W.Va. 454, 388 S.E.2d 480 (1989) ("[e]qual protection of the law is implicated when a classification treats similarly situated persons in a disadvantageous manner. The claimed discrimination must be a product of state action as distinguished from a purely private activity."). Thus, the instant case is not governed by *Chafin*, but presents an entirely separate issue: may the Legislature impose specific funding requirements which must be included in the excess levy proposals of some but not all county boards of education?

To answer that question, we begin with a brief history of this Court's prior decisions involving Special Acts of the Legislature requiring county school boards to provide funding for public libraries and, in the case of Cabell County, for the Park District as well. There are eleven counties whose boards were governed by Special Acts:[11] the nine

---

[11] We noted in *Board II* that

> [t]his Court can discern no rationale as to why the nine
> Special Act counties [at issue in that case] were subjected to

12

counties whose Acts were at issue in *Board II*, which were initially required to fund their respective counties' public libraries from their regular annual levies, and Cabell and Lincoln Counties, whose Special Acts require them to provide such funding from their excess levies, assuming such levies are approved by the voters.

In *Board of Education of the County of Kanawha v. West Virginia Board of Education (Board I)*, 219 W. Va. 801, 639 S.E.2d 893 (2006), this Court addressed a constitutional challenge brought by the Kanawha County Board of Education ("the Kanawha County Board") to West Virginia Code sections 18-11A-11 to -12 (2022)[12] on

---

the Special Acts, nor any particular similarities between them as pertains to their public libraries or schools. Nor, however, is it proper for this Court to speculate about any theoretical common thread in an effort to uncover the justification for the unequal classification.

231 W. Va. at 406 n.26, 745 S.E.2d at 444 n.26. The same observation may be made in the instant case which involves Cabell County, one of the remaining two Special Act counties.

[12] West Virginia Code sections 18-9A-11 to -12 are contained in the comprehensive Public School Support Plan, W. Va. Code §§ 18-9A-1 to -26 (2022) ("the school funding formula"), which the Legislature designed to ensure that all county school boards are financially equipped to provide the "thorough and efficient system of free schools" guaranteed by the West Virginia Constitution, article XII, section 1. We explained the operation of sections 11 and 12 as follows:

Very broadly, the operation of the formula may be described as follows. First, a county's estimated level of need, or "basic foundation program," is determined. The basic foundation program is the total sum required for each of seven categories of need. viz., professional educators, service personnel, fixed costs, transportation costs, administrative costs, other current expenses and substitute employees, and

13

the ground that "[these provisions] operate[d] to treat county school boards required by law to provide financial support to non-school purposes less favorably than county school boards with no such requirement." 219 W. Va. at 808, 639 S.E.2d at 900. Because the statutes provided no downward adjustment of Kanawha County's local share, *see supra* note 12, to reflect the monies which were required by Special Act to be diverted from its regular tax levy to the library, the county suffered a diminution of its state funding which is based on "the difference between the basic foundation program and the local share." *Id.* at 804, 639 S.E.2d at 896; *see also* W. Va. Code § 18-9A-12.

The circuit court found "that in fiscal year 2002–2003, $2,209,600.00 of Kanawha County's regular tax levy funds were remitted under the Special Act to the Kanawha County Public Library, and that in fiscal year 2003-2004, the diverted amount was $2,228,070.00." 219 W. Va. at 805, 639 S.E.2d at 897. Further,

improvement of instructional programs. W. Va. Code, 18-9A-12.

Second, the county's "local share" must be computed. W. Va. Code, 18-9A-11(a). Local share is the amount of tax revenue which will be produced by levies, at specified rates, on all real property situate in the county. Local share thus represents the county's contribution to education costs on the basis of the value of its real property. State funding is provided to the county in an amount equal to the difference between the basic foundation program and the local share. W. Va. Code, 18-9A-12.

*Board I*, 219 W. Va. at 804, 639 S.E.2d at 896.

14

when the State school board calculate[d] the County school board's local share under W. Va. Code § 18-9A-11, for each fiscal year, it include[d] in the local share the portion of the regular tax levy remitted to the library pursuant to the Special Act. The County school board explain[ed] in its brief to this Court that "the effect of this fictitious inflation of the Kanawha Board's Local Share was a *pro tanto* diminution in these amounts in such fiscal years of the Kanawha Board's [state share]."

219 W. Va. at 805, 639 S.E.2d at 897. However, notwithstanding these findings, which made it incontrovertibly clear that the operation of the Kanawha County Special Act significantly diminished the amount of funding the county's board of education would otherwise have received pursuant to West Virginia's school funding formula, the circuit court denied relief on the ground that "the [Kanawha County Board of Education] is providing a thorough and efficient education to Kanawha County's students. In doing so, the [Board] is able to provide salary supplements to the teachers and to carry over surplus every fiscal year ranging from $6,000,000.00 to $13,000,000.00." *Id.*

On appeal this Court reversed, holding that

W. Va. Code § 18-9A-12 (1993), to the extent that it fails to provide that a county school board's allocated state aid share shall be adjusted to account for the fact that a portion of the county school board's local share is required by law to be used to support a non-school purpose, violates equal protection principles because it operates to treat county school boards required by law to provide financial support to non-school purposes less favorably than county school boards with no such requirement.

219 W. Va. at 802, 639 S.E.2d at 894, Syl. Pt. 6.

15

In the wake of *Board I* the Legislature attempted to remedy the constitutional infirmity identified by this Court, not by amending West Virginia Code section 18-9A-12 but rather by amending section 18-9A-11, in two relevant respects. First, in the apparent belief that our opinion in *Board I* rested wholly or in significant part on the Court's implicit holding that public libraries serve a "non-school purpose," the Legislature enacted new subsection 11(f), which specifically stated that such libraries serve a "legitimate school purpose."[13] W. Va. Code § 18-9A-11(f) (2008). Second, the Legislature also enacted new subsection 11(h), which provided that

> the county board of any county with a special act creating a
> library obligation out of the county's regular school levy
> revenues may *transfer that library obligation so that it*

---

[13] We subsequently dispelled the Legislature's assumption as to the significance of the "non-school purpose" language in *Board I*:

> "Our decision in *Board I* was not predicated on the fact that the
> library funding obligation was a non-school purpose,
> notwithstanding the references thereto in the opinion. Rather,
> both the standard applied in *Board I* and our holding make
> plain that it was the lack of uniformity that created the equal
> protection violation: 'A statute that creates a lack of uniformity
> in the State's educational financing system is subject to strict
> scrutiny[.]' Syl. Pt. 4, in part, *Board I*. It was the mere fact of
> the disparate treatment of Kanawha County which was the
> essence of the equal protection violation found—not the
> nature, quality or type of the disparate treatment."

*Board II*, 231 W. Va. at 403, 745 S.E.2d at 441 (footnote omitted).

16

*becomes a continuing obligation of its excess levy revenues instead of an obligation of its regular school levy revenues,* subject to the following:

(1) If a county board chooses to transfer the library obligation pursuant to this subsection, the library funding obligation shall remain an obligation of the regular school levy revenues until the fiscal year in which the excess levy is effective or would have been effective if it had been passed by the voters;

(2) If a county board chooses to transfer the library obligation pursuant to this subsection, the county board shall include the funding of the public library obligation in the same amount as its library funding obligation which exists or had existed on its regular levy revenues as one of the purposes for the excess levy to be voted on as a specifically described line item of the excess levy: Provided, That if the county board has transferred the library obligation to the excess levy and the excess levy fails to be passed by the voters or the excess levy passes and thereafter expires upon the time limit for continuation as set forth in section sixteen, [§ 11-8-16], article eight, chapter eleven of this code, then in any subsequent excess levy which the county board thereafter submits to the voters the library funding obligation again shall be included as one of the purposes of the subsequent excess levy as a specifically described line item of the excess levy;

(3) If a county board chooses to transfer the library obligation pursuant to this subsection, regardless of whether or not the excess levy passes, effective the fiscal year in which the excess levy is effective or would have been effective if it had been passed by the voters, a county's library obligation on its regular levy revenues is void notwithstanding any provision of the special acts set forth in subsection (g) of this section to the contrary[.]

W. Va. Code 18-9A-11(h) (2008) (emphasis added). Thereafter, the Kanawha County

Board filed suit against the West Virginia Board of Education ("the State Board"),

challenging the constitutionality of both revised West Virginia Code section 18-9A-11 and

Chapter 178 of the Acts of the Legislature, Regular Session, 1957 ("the Kanawha Special

Act") on equal protection grounds. The Kanawha County Public Library Board ("the

Kanawha County Library") intervened as a party defendant. *See Board II*, 231 W. Va. at

390, 745 S.E.2d at 428. Although the case languished for several years without factual or

legal development, the circuit court ultimately granted summary judgment for the Kanawha

County Board, finding that both the statute and the Special Act violated equal protection

principles. Of specific relevance to the instant case, the court concluded that the

Legislature's action in

> moving the obligation to the excess levy was . . . unequal
> treatment since *no other counties must do so* and "are free to
> maximize their excess levy revenues for school purposes" and
> therefore, "are not subject to the risk of voters rejecting their
> excess levies due to the including of a multi-million dollar
> library funding obligation."

*Board II*, 231 W. Va. at 394, 745 S.E.2d at 432 (emphasis added).


The Kanawha County Library and the State Board appealed, and this Court

affirmed:

> [T]his Court finds that the fact that the Kanawha County BOE
> is being treated differently than forty-six other counties[14] by

---

[14] The Court's reference to "forty-six other counties" makes it clear that the decision
in *Board II* applied by its express terms only to the nine Special Act counties which were

virtue of its mandatory library funding obligation is fairly manifest, notwithstanding the Legislative amendments. The non-Special Act counties may utilize their discretionary retainage for any purpose which they see fit and proper; Kanawha County's discretionary retainage is encumbered to the extent of the funding obligation. Moreover, the option of transferring the obligation to the excess levy does nothing to alleviate the disparate treatment. The non-Special Act counties are not set with the Hobson's choice of choosing to deplete their discretionary retainage to satisfy the library funding obligation or risking the failure of their excess levy and the educational "extras" it affords by placing a large library funding line item on the ballot.

*Id.* at 404, 745 S.E.2d at 442 (footnote added). Succinctly put, we found that the crux of the equal protection problem inherent in Special Acts was not the revenue stream, i.e., regular levies or excess levies, but rather the fact that Special Act counties were treated differently than non-Special Act counties "by virtue of [their] mandatory library funding obligation[s.]" *Id*.

In the instant case, the Board contended below, and argues on appeal, that the mandatory library funding provisions contained in the Public Library Special Act and the mandatory park district funding provisions contained in the Park District Special Act violate equal protection pursuant to this Court's decision in *Board II*. The circuit court

---

originally required to fund their library obligations from their discretionary retainage. *See supra* text. The question before us in the instant case is whether the Court's rationale in *Board II* would also apply to Cabell County, one of the two remaining Special Act counties, notwithstanding that its Library (and Park District) funding obligations have never had any impact on the monies it receives pursuant to the school funding formula. *See* W. Va. Code §§ 18-9A-1 to -26.

disagreed, finding that *Board II* does not apply because in that case we specifically identified only nine counties affected by our decision – all counties whose boards of education were required by Special Acts to divert a portion of their *regular* levy receipts to support their counties' public libraries. The court wrote that "[i]n sharp contrast, the Public Library Special Act and the Park District Special Act do not burden the Cabell BOE's *regular* levy receipts or its discretionary retainage, and the Cabell BOE is not required to make a 'Hobson's choice.'" (Emphasis added). Finally, the court found it significant that the money collected pursuant to Cabell County's excess levies "never becomes part of the Cabell BOE's budget or enters its accounts."

We agree with the circuit court that the Cabell County and Lincoln County Special Acts were not directly addressed in *Board II*, *see supra* note 14, but disagree that ipso facto the case does not apply to the constitutional challenge presented here. Similarly, we agree with the court that the Cabell County Special Acts are different from those of the nine counties involved in the *Board II* litigation, in that they place a funding obligation on the county's excess levy receipts rather than on its regular levy receipts. However, it is clear that this difference is immaterial to the constitutional issue presented here: whether the Special Acts at issue create a discriminatory classification and, if so, whether there exists a compelling State interest to justify this classification. *See Pauley*, 162 W. Va. at 672, 255 S.E.2d at 861, Syl. Pt. 4: "Because education is a fundamental, constitutional right in this State, under our Equal Protection Clause any discriminatory classification found in

20

the State's educational financing system cannot stand unless the State can demonstrate some compelling State interest to justify the unequal classification."

As was the case in *Board II*, the first question is easily answered because "the fact that the [Board] is being treated differently than [fifty-three] other counties by virtue of its mandatory library funding obligation [and Park District funding] is fairly manifest." *Board II*, 231 W. Va. at 404, 745 S.E.2d at 442. Pursuant to the West Virginia Constitution, article X, section 10, every county in this State is authorized to increase "tax levies on the several classes of property for the support of public schools . . . for a period not to exceed five years," if such increase is approved by a majority of the county's voters. As of mid-2022, forty-four counties had passed excess levies pursuant to this constitutional grant of authority. *See* Ellie Heffernan, *West Virginia schools rely on voters to approve additional funding. When residents vote down a levy, students suffer*, MOUNTAIN STATE SPOTLIGHT, August 25, 2022, http://www.mountainstatespotlight.org/2022/08/25/west-virginia-school-levy-funding-fails/. Significantly, only two of those counties, Cabell and Lincoln, are required by virtue of the Special Acts herein to put line items for libraries (and in the case of Cabell County, park services as well) on their excess levy proposals; the other forty-two counties, as well as the eleven counties whose voters have not approved excess levies, have no such restrictions placed on the uses for which excess levy funds may be sought. Thus, Cabell and Lincoln Counties are disadvantaged in two significant ways vis-à-vis the other fifty-three counties: first, their boards of education have less freedom of choice with respect to what educational "extras" to ask the voters to fund, since they are required by

21

the Special Acts to make library funding (and park funding) two of those "extras"; and second, they run a greater risk of "failure of their excess levy and the educational 'extras' it affords by placing a large library [and park service] funding line item on the ballot." *Board II*, 231 W. Va. at 404, 745 S.E.2d at 442. Additionally, as noted *supra* the Board does not have the option of meeting both its own identified needs as well as its obligations to the Library and the Park District by increasing the total amount of tax revenues sought in an excess levy, because the West Virginia Constitution, article X, section 10, limits the amount sought to one hundred percent of the "maximum rates authorized and allocated by law for tax levies on the several classes of property[.]" *Id.* In short, the total amount sought in an excess levy is circumscribed by factors beyond the Board's control: the amount of Class I, Class II, Class III, and Class IV property located in Cabell County and the statutory tax rates for such property.

In summary, the requirements of the Special Acts result in *less favorable treatment* of Cabell and Lincoln Counties with respect to choosing what their boards of education deem to be the "extras" that will best enhance their educational offerings. *See* 231 W. Va. at 388, 745 S.E.2d at 427-28, Syl. Pt. 11, in part (quoting *Board I*, 219 W. Va. at 803, 639 S.E.2d 895, Syl. Pt. 6, in part) (holding that West Virginia Code section 18-9A-12 "violates equal protection principles because it operates to treat county school boards required by law to provide financial support to non-school purposes less favorably than county school boards with no such requirement.").

Our initial inquiry having demonstrated the clear existence of less favorable treatment of Cabell and Lincoln Counties with respect to the requirements imposed upon their excess levy proposals, we turn to the question of whether the respondents can demonstrate some compelling State interest to justify the inequality. *See Pauley*, 162 W. Va. at 672, 255 S.E.2d at 861, Syl. Pt. 4, in part; *accord* Syl. Pt. 2, *State ex rel. Bd. of Educ. for Cnty. of Randolph v. Bailey*, 192 W. Va. 534, 535, 453 S.E.2d 368, 369 (1994).[15] This question is also easily answered because the respondents have not suggested the existence of any State interest, let alone a compelling State interest, to justify the requirement that the Boards of Education of Cabell and Lincoln Counties – alone among the State's fifty-five counties – include library funding and park service funding on any excess levy proposal, and we discern none. *See supra* note 11.

In light of the foregoing, we find that the instant case is controlled by the rationale underpinning our decision in *Board II*, which focused on the "lack of uniformity

---

[15] We reject the respondents' argument that a compelling interest standard set forth in *Pauley* and its progeny does not apply to this case because excess levy receipts have no direct effect on the school funding formula established by the Legislature to create a thorough and efficient system of public schools. *See* W. Va. Code §§ 18-9A-1 to -26. The "extras" provided by excess levy funding enable a county to enhance the educational opportunities available to its students, all of which serves what we have described as "the people's clear mandate to the Legislature, that public education is a prime function of our State government." *Pauley*, 162 W. Va. at 719, 255 S.E.2d at 884 (footnote omitted); *see also* Syl. Pt. 13, *State v. Beaver*, 248 W. Va. 177, 887 S.E.2d 610, 616 (2022) ("The mandatory requirements of 'a thorough and efficient system of free schools' found in Article XII, Section 1 of the West Virginia Constitution, make education a fundamental, constitutional right in this State.").

in the educational financing system." In *Board II*, the lack of uniformity arose from the operation of West Virginia Code section 18-9A-11 on nine Special Act counties, leaving forty-four counties free of any obligation to fund their public libraries. In the instant case, the lack of uniformity arises from the operation of the Cabell County Special Acts, which impose a requirement that the Board include funding for the Library and the Park District on any excess levy proposal, leaving the remaining fifty-three counties free of any such obligation. Accordingly, we hold that to the extent that Chapter 207 of the Acts of the Legislature, Regular Session, 1967, and Chapter 187 of the Acts of the Legislature, Regular Session, 2011, require the Board of Education of the County of Cabell, West Virginia, to include funding for the Cabell County Public Library and the Greater Huntington Park and Recreation District, respectively, on its excess levy proposals, while the boards of education of fifty-three other counties are free to seek voter approval of excess levy funding without such restriction, the Acts violate the equal protection guarantees of the West Virginia Constitution, article III, section 10, and are thus unenforceable.

We turn now to the second issue in this case: whether the respondents are entitled to equalization payments for fiscal years 2024 and 2025 pursuant to Cabell County voters' passage of the May 18, 2018, excess levy. The Board first argues, in effect, that this issue is wholly subsumed by the preceding issue, i.e., that if the Special Acts are unconstitutional insofar as they compel *any* Library or Park District funding, they cannot be read to compel funding beyond the specific amounts set forth on the excess levy ballot. We disagree, as our decision today cannot and does not erase history; on May 28, 2018,

24

the voters of Cabell County approved passage of an excess levy providing funding to the Library and the Parks District for a five-fiscal-year period, and the exercise of their rights under West Virginia Constitution, article X, section 10, must prevail notwithstanding the Board's belated attack on the constitutional validity of its own levy proposal. Thus, to resolve the question of whether the respondents are entitled to equalization payments for fiscal years 2024 and 2025, we review what information voters were given on the May 18, 2018, excess levy ballot because "[t]he true interpretation of the language of a special levy proposal is *the meaning given to it by the voters of the county*, who, by their approval of the special levy, consent to be taxed more heavily to provide the necessary funds." Syl. Pt. 1, *Thomas v. Bd. of Educ. of McDowell Cnty.*, 164 W. Va. 84, 261 S.E.2d 66 (1979) (emphasis added).

First, as set forth *supra*, voters were informed that the Board was requesting passage of an excess levy to provide certain sums of money for certain purposes, including $1,471,860.00 annually for the Library and $455,229.00 annually for the Park District. Significantly, the ballot did not indicate that the amounts sought, either in total or for the twelve specific categories of need,[16] were estimates; rather, the ballot stated simply that

---

[16] The twelve categories included: Professional Salary, $7,05,547.00; Service Salary, $2,050,000.00; Substitute, $1,101,000.00; Athletics, $3,336,378.00; Personnel Taxes and Benefits, $3,336,378.00; Textbooks, Digital Resources, Supplies, Postage, Insurance and Travel, $2,287,538.00; Contracted Services, $1,700,000.00; Construction, Repair and Maintenance, $1,232,000.00; Equipment and Rentals, $1,691,937.00; Cabell County Public Library, $1,471,869.00; Greater Huntington Park and Recreation District,

this was an "[e]lection to authorize additional levies for the fiscal years beginning July 1, 2020, July 1, 2021, July 1, 2022, July 1, 2023 and July 1, 2024, *in the total amount of $24,128,149.00 annually* for the purpose of paying the current expenses of [the Board.]" (Emphasis added).[17]

The respondents point out language on the ballot specifically referencing "Section 5, Chaptr 207, of the 1967 Acts of the West Virginia Legislature" and "Section 7, Chapter 194, of the 1983 Acts of the West Virginia Legislature[.]" *See supra* text. Based

---

$455,229.00; Technology, $1,119,651.00. The total for all twelve categories was $24,128,149.00.

[17] The ballot further provided that

> [i]n the event The Board of Education of the County of Cabell shall obtain additional money by grant or otherwise from the state or federal government, or from any agency of either, *or from any other sources*, for the purposes aforesaid, levy monies specified for these purposes may be used for the general operation of the school system. The additional levies shall be on Class I property 22.95¢; on Class II property, 45.90¢; on Class III property 91.80¢; on Class IV property, 91.80¢, for each tax year that property tax revenues are not projected.

(Emphasis added).

The Board argues that the difference between the amounts the relevant tax rates were estimated to generate for the Library and the Park District, i.e., the specific amounts listed on the excess levy ballot, and the amounts actually assessed and collected over the course of each fiscal year, falls within the rubric of "additional money . . . from any other sources" and can thus "be used for the general operation of the school system[.]" We find it unnecessary to resolve this issue, although we note that the principle of *ejusdem generis* would militate against construing "additional money . . . from any other sources" as broadly as the Board urges.

on these references, the respondents contend that voters were on notice that (a) per Section 5(B) of the Library Special Act, the Library was to receive "per $100 of assessed valuation of the property taxable in the area served by it according to the last assessment for state and county purposes" the following amounts: 1.4 cents for Class I Property; 2.8 cents for Class II Property, and 5.6 cents for Class III and Class IV Properties; and (b) per Section 7(b)(3) of the Park District Special Act, the Park District was to receive "on each $100 of assessed valuation of the property taxable in the area served by it according to the last assessment for state and county purposes" the following amounts: 0.433 cents for Class I Property, 0.866 cents for Class II Property, and 1.73 cents for Class III and Class IV Property. Accordingly, the respondents argue, the above-cited language of the Special Acts controls over the specific amounts shown on the excess levy ballots, and the respondents are entitled to what the Special Acts give them: equalization payments representing the difference between the estimated tax receipts shown on the ballot and the actual amounts assessed and collected during each relevant fiscal year.

The circuit court agreed with the respondents, finding that the Acts "do not limit the amounts due . . . to the estimates included on the levy ballots. Instead, the amounts due are the actual taxes assessed and collected. Under the language of the Special Acts, the payment of these amounts is not discretionary."

Although we find this to be a close question, "we must be guided by the purpose the voters of [Cabell] County sought to effect in approving the special levy rather

27

than by the intention of those who interpreted the proposal." *Thomas*, 163 W. Va. at 89, 261 S.E.2d at 69-70. In that regard, specific amounts sought for Library and Park District funding were set forth on the face of the ballot for voters to read, *see supra* note 16, and there was no indication that these were only estimated amounts.[18] Further, although the ballot referenced the Special Acts, it did not set forth any of the provisions contained therein and thus cannot reasonably be said to have put voters on notice of those provisions. Therefore, under the particular facts and circumstances of this case, we find that at the May 28, 2018, excess levy election, the "meaning given to [the ballot language] by the voters of the county"[19] was that they were being asked to provide a line-item amount of $1,471,860.00 in yearly funding for the Library and $455,229.00 in yearly funding for the Park District, *not* a percentage of actual levy collections.

In light of the foregoing, we conclude that although the Board was and is required to make annual payments in the amounts specified on the excess levy ballot to the Library and the Park District for fiscal years 2021, 2022, 2023, 2024, and 2025, it was not required to make equalization payments for fiscal year 2024 and is not required to make such payments for fiscal year 2025. The circuit court's decision, which came to a contrary conclusion, is accordingly reversed.

---

[18] The fact that the amounts were "approximate" was referenced in the Board's Levy Order but not on the ballot which was presented to the voters.

[19] *See Thomas*, 164 W. Va. at 84, 261 S.E.2d at 67, Syl. Pt. 1, in part.

28

## IV. Conclusion

For the foregoing reasons, the circuit court's order of December 1, 2023, is reversed, and this case is remanded with instructions for the court to enter an order dismissing the respondents' Verified Petition for Writ of Mandamus.

Reversed and remanded with instructions.